## JOHN BACON v. THE MICHIGAN CENTRAL RAILROAD COMPANY.

*Libel and slander—Privileged communications—Malice—Burden of proof—Evidence.*

Plaintiff sued defendant for an alleged libel, and the trial court held the communication charged as libelous to be privileged, and that the plaintiff, in order to recover, must prove that it was published with *express* malice, upon which point he held there was an *entire* absence of evidence, and directed a verdict for the defendant.

CHAMPLIN, J., filed an opinion, concurred in by SHERWOOD, J., holding that the communication was privileged, but favoring a reversal on the ground that there was evidence from which the jury would have been justified in finding express malice in such publication.

CAMPBELL, C. J., concurred in a reversal, because not satisfied that the libel was privileged.

MORSE, J., concurred in a reversal.

Error to Berrien. (Smith, J.) Argued April 6, 1887. Decided June 9, 1887.

Case. Plaintiff brings error. Reversed. The facts are stated in the opinion.

*Clapp & Bridgman,* for appellant.

*Edwards & Stewart (Ashley Pond, Henry Russell,* and *Otto Kirchner,* of counsel), for defendant.

CHAMPLIN, J. The Michigan Central Railroad Company is, and for a long time has been, engaged in operating a railroad extending from Detroit to Chicago. It employs agents at different points on its line, who have the care of divisions of its road, and who are authorized to hire men to work for defendant. It has adopted and carried into effect a plan by

which every employé who is discharged from its service is reported to every agent authorized to employ men upon the line of its road regularly once a month. A list is made out by the assistant superintendent in charge of a division, in which is entered the names of the persons discharged the previous month, their occupation and cause; and this list is sent to each of the agents of the company authorized to employ men, and by them these lists are kept on file for their future reference and guidance in employing men. If a person who has been discharged from the service of the company applies for employment, the agent examines the list; and, if it there appears that he was discharged for some offense, he refuses to employ him. The railroad company claims that the plan adopted is essential to the efficiency of the force employed by it, and to the protection of the company and the public against engaging in its service incompetent or dishonest servants.

The plaintiff is a carpenter, and had been employed by the defendant for three or four years in the bridge department. He resided at Niles, a station on the line of defendant's road. He had been at work at Michigan City under a foreman by the name of Palmer, and about the fourteenth of March, 1882, and on the evening of that day, he entered the fast train of defendant to ride to Niles. He sat in the smoking car, which was poorly lighted, and he threw his overcoat in a seat near by. When he reached Niles, on leaving the train in a hurry, by mistake he picked up a coat which was not his, and left his own, and carried it, with his tools, to the company's shop, and threw it across a bench. The owner of the coat, who was at the time in the dining car, on returning, discovered his loss, and reported it to the conductor. The coat which belonged to the plaintiff was found where plaintiff and other employés had been sitting. It was an old coat, much worn, and had on it a leather button, attached to a string. The conductor telegraphed the

chief train dispatcher at Jackson that there had been a coat taken on his train at Niles by one of Mr. Palmer's men, and another left in its place. The matter was placed in the hands of a special agent or detective of the company, who sent word to Mr. Humphrey, another employé of the company, at Niles. The next morning after he received word from the special agent, he went into the yard where Mr. Bacon was at work, and asked him if his coat had a leather button on it, and he said it had. He then told him he had such a coat in the baggage room, and that he (Bacon) had made a mistake, and got another coat. Bacon then went over to the bench where he had left the coat he had taken from the car, and handed it to Humphrey, saying that it was not his, and advised Humphrey to send it back. The coats were quite dissimilar; the plaintiff's being a much worn chinchilla, and the other a beaver cloth coat, some worn, but in good condition. The special agent made his report to the assistant superintendent, stating that the coat had been taken from the train, and that there was a big mistake,—after seeing both coats,—so much so that he could not believe the man honest who had taken it, and told him "that we had enough to do to watch professional thieves without watching our own men." He both wrote and had a personal interview with the assistant superintendent. He did not, before he made the report, go to Niles to make examination in reference to the case. His report was based upon the inspection of the two coats, and what he had learned from Mr. Humphrey and the conductor. He testified that he believed what he stated in his report to Mr. Brown, the assistant superintendent. A day or two later, plaintiff was discharged, for which no cause was assigned at the time. Mr. George Dollivar was the defendant's agent at Niles as division road-master, and whose duty it was to employ men. He received one of these discharged lists in April, 1882, for the month of March. Plaintiff came to him, and requested to see the

list. He showed it to him. It contained, among other names, the following:

| March, | | 1882. |
| --- | --- | --- |
| NAME. | OCCUPATION. | WHY DISCHARGED. |
| Bacon, John. | Carpenter. | Stealing. |

Thereupon the plaintiff brought this action of libel against defendant.

The court charged the jury that the communication was privileged, and the plaintiff could not recover without proving affirmatively not only the falsehood of its contents, but also that it was published with express malice; and upon the latter point he instructed the jury that there was no evidence to go to them, and he directed a verdict for the defendant. This charge of the court raises the only questions for our consideration, which are, *first*, was the communication privileged; and, *second*, did the court err in taking the case from the jury on the ground of an entire want of evidence of express malice.

It is not claimed that the communication belongs to that class which are absolutely privileged, but counsel for defendant contend that it was a publication which related to a matter in which the defendant was interested, and concerning which the corporation and its officers to whom it was sent must needs be advised in order to prosecute defendant's business successfully, and therefore it was *prima facie* privileged; and, to entitle plaintiff to recover, he must show that the publication was both false and malicious.

The great underlying principle upon which the doctrine of privileged communications stands, is public policy. This is more especially the case with absolute privilege, where the interests and necessities of society require that the time and occasion of the publication or utterance, even though it be both false and malicious, shall protect the defamer from all

liability to prosecution for the sake of the public good. It rests upon the same necessity that requires the individual to surrender his personal rights and to suffer loss for the benefit of the common welfare. Happily for the citizen, this class of privilege is restricted to narrow and well-defined limits. Qualified privilege exists in a much larger number of cases. It extends to all communications made *bona fide* upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, to a person having a corresponding interest or duty. And the privilege embraces cases where the duty is not a legal one, but where it is of a moral or social character of imperfect obligation. *Thompson v. Dashwood,* 11 Q. B. Div. 45; *Davies v. Snead,* L. R. 5 Q. B. 611; *Waller v. Lock,* 45 Law T. (N. S.) 243; *Somerville v. Hawkins,* 10 C. B. 583, 20 Law J. C. P. 131; *Toogood v. Spyring,* 1 Cromp., M. & R. 181; *Capital and Counties Bank v. Henty,* 7 App. Cas. 741; *Delaney v. Jones,* 4 Esp. 193; *Laughton v. Bishop, etc.,* L. R. 4 P. C. 495, 504; *Harrison v. Bush,* 5 El. & Bl. 344, 25 Law J. Q. B. 25; *Whiteley v. Adams,* 15 C. B. (N. S.) 392, 33 Law J. C. P. 89; *Shipley v. Todhunter,* per Tindal, C. J., 7 Car. & P. 680; *Harris v. Thompson,* 13 C. B. 333; *Wilson v. Robinson,* 7 Q. B. 68, 14 Law J. Q. B. 196; *Taylor v. Hawkins,* 16 Q. B. 308, 20 Law J. Q. B. 313; *Manby v. Witt,* 18 C. B. 544, 25 Law J. C P. 294; *Lewis v. Chapman,* 16 N. Y. 372; *Henwood v. Harrison,* 41 Law J. C. P. 206; *Edwards v. Chandler,* 14 Mich. 471; *Washburn v. Cooke,* 3 Denio, 110; *Knowles v. Peck,* 42 Conn. 386; *Easley v. Moss,* 9 Ala. 266; *Van Wyck v. Aspinwall,* 17 N. Y. 190; *Cockayne v. Hodgkisson,* 5 Car. & P. 543; *M'Dougall v. Claridge,* 1 Camp. 267; *Weatherston v. Hawkins,* 1 Term R. 110.

The communication in question here is clearly within the principle of the cases above cited. It was made by a person interested in behalf of defendant company, and having in

charge its affairs to a certain extent, to another person alike interested in behalf of the company regarding matters pertaining to his duties as an agent of the company authorized to employ men.   Care was taken to restrict the communication to the proper persons, and also to prevent undue publicity.   It is not only proper, but it is of the utmost importance to the company, and to the public having business transactions with it, that the servants employed by it shall be men of good character, temperate, and efficient.   Corporations may be liable for the negligence of their employes; not only so, but they may be held responsible for not engaging suitable servants, as well as for continuing in their employment unsuitable servants whereby third persons suffer loss or injury through the want of care, skill, temperate habits, or honesty of such servants.  The plan adopted and pursued by the defendant was intended to protect the company against employment of persons whom it had found to be unworthy or inefficient, and is as fully privileged as a communication from one stockholder to another respecting the employment of a superintendent, or from one partner to another respecting the employment of a book-keeper, or from a person interested in a lawsuit to another interested respecting the solicitor employed.   But it is said that it was not necessary to state the cause of the discharge; that the communication was from a superior to a subordinate, and would have been sufficient to state the fact of the discharge, without stigmatizing the plaintiff as a thief.   This objection goes only to the character of the language used, and not to the occasion.   The occasion determines the question of privilege.  .The language is only proper to be considered in connection with the question of malice.   In the discharge list put in evidence there appear the names of 30 persons who were discharged in March, 1882.  Of these six were discharged for drunkenness and intemperance, who had been employed as clerks, brakemen, switchmen, and laborers;

others for incompetency and carelessness. It is in proof that defendant had about 5,000 men in its service, and any one can see that some system is necessary to prevent being imposed upon by persons unfit to be engaged in such important business as operating a railroad, where lives and property depend upon the trustworthiness of those filling every grade of employment down to and including the common laborer. The ruling of the court as to the privileged character of the communication was correct.

The meaning in law of a privileged communication is that it is made on such an occasion as rebuts the *prima facie* inference of malice arising from the publication of matter prejudicial to the character of the plaintiff, and throws upon him the *onus* of proving malice in fact; but not of proving it by extrinsic evidence only: he has still a right to require that the alleged libel itself shall be submitted to the jury, that they may judge whether there is any evidence of malice on the face of it. *Wright v. Woodgate*, 2 Cromp., M. & R. 573, 1 Gale, 329. It was held in *Somerville v. Hawkins, supra,* that, a communication being shown to be priviliged, it lies upon the plaintiff to prove malice in fact; that, in order to entitle him to have the question of malice left to the jury, he need not show circumstances necessarily leading to the conclusion that malice existed, or such as are inconsistent with its non-existence, but they must be such as raise a probability of malice, and be more consistent with its existence than its non-existence; and in *Cooke v. Wildes*, 5 El. & Bl. 329, it was held that if the occasion creates such privilege, but there is evidence of express malice, either from extrinsic circumstances or from the language of the libel itself, the question of express malice should be left to the jury. In actions for defamation, malice is an essential element in the plaintiff's case. But in these cases the word "malice" is understood as having two significations; one, its ordinary meaning of ill will against a person, and the other its legal

signification, which is a wrongful act done intentionally, without just cause or excuse. These distinctions have been denominated *malice in fact* and *malice in law.* The first implies a desire and an intention to injure; the latter is not necessarily inconsistent with an honest purpose, but, if false and defamatory statements are made concerning another without sufficient cause or excuse, they are legally malicious, and in all ordinary cases malice is implied from the defamatory nature of the statements and their falsity. The effect, therefore, of showing that the communication was made upon privileged occasion is *prima facie* to rebut the quality or element of malice, and casts upon the plaintiff the necessity of showing malice in fact,—that is, that the defendant was actuated by ill will in what he did and said, with a design to causelessly or wantonly injure the plaintiff,—and this malice in fact, resting, as it must, upon the libelous matter itself and the surrounding circumstances tending to prove fact and motive, is a question to be determined by the jury. The question whether the occasion is such as to rebut the inference of malice if the communication be *bona fide* is one of law for the court; but whether *bona fides* exist is one of fact for the jury. 1 Amer. Lead. Cas. (5th ed.) 193; *Smith v. Youmans,* 3 Hill (S. C.) 85; *Hart v. Reed,* 1 B. Mon. 166, 169; *Gray v. Pentland,* 4 Serg. & R. 420, 423; *Flitcraft v. Jenks,* 3 Whart. 158. The jury may find the existence of actual malice from the language of the communication itself, as well as from extrinsic evidence. *Hastings v. Lusk,* 22 Wend. 410, 421; *Coward v. Wellington,* 7 Car. & P. 531, 536; *Wright v. Woodgate,* per Parke, B., 2 Cromp., M. & R. 573, 578; *Jackson v. Hopperton,* 16 C. B. (N. S.) 111 E. C. L. 829.

I agree with Erle, C. J., in the case last cited, that—

" A plaintiff does not sustain the burden of proof which is cast upon him by merely giving evidence which is equally consistent with either view of the matter in issue. When the

presumption of malice is neutralized by the circumstances a·tending the utterance of the slander or the publication of the libel, the plaintiff must give further evidence of actual or express malice in order to maintain his action."

Was there evidence here which would warrant the jury in inferring that defendant acted from malicious motives when charging that plaintiff was discharged from its employment for "stealing?" The case is obscured somewhat from the fact that the defendant is a corporation, and its motives must be sought for in the acts and utterances of its agents, authorized or ratified by the corporation. The communication itself charges a crime. If made wantonly; if made without any reasonable evidence of its truth, or such evidence or circumstances as would lead an ordinarily prudent person to believe its truth; if the means of investigation were at hand, and none were made; or, if investigation was made, the extent of the investigation, and what transpired,— in short, all the facts and circumstances which preceded and led up to the charge of stealing,—were proper, together with the charge itself, to be submitted to the jury; and from the whole evidence it was their province to determine whether the charge was made through personal ill will or a wanton disregard of the character and rights of plaintiff. To my mind, there was evidence, intrinsic and extrinsic, from which the jury would have been justified in finding that the defendant was actuated by malice in fact, or express malice. The intrinsic evidence is found in the charge itself, taking for granted what was proved, that the exchange of coats was a mistake, caused by carelessness or negligence, without any criminal intent. It was for the jury to say that the circumstances ·were such under which the coat was taken, the information received by the special agent, the report made to the assistant superintendent, as to repel and rebut the *bona fides* of the defendant's agents in stating that plaintiff was discharged for stealing. And, while I think there was evidence tending to

show that the agents of the defendant were acting through spite or resentment towards plaintiff because he had not exercised greater care when taking the wrong coat when leaving the car, yet I fully agree in the remarks of Baron Parke in *Toogood v. Spyring,* 1 Cromp., M. & R. 193, that if such communications are *fairly* warranted by any reasonable occasion or exigency, and honestly made, such communications are protected for the common convenience and welfare of society, and the law has not restricted the right to make them within any narrow limits. If the agents of the defendant honestly believed that the plaintiff took the coat in question under the circumstances detailed to them, with the intention of appropriating it to his own use, the defendant is protected in having listed plaintiff as having been discharged for stealing. I think the evidence in the case should have been submitted to the jury to determine whether defendant, through its agents, acted in good faith, under all the circumstances of the case. *Klinck v. Colby,* 46 N. Y. 427; *Brow v. Hathaway,* 13 Allen, 239; *Gassett v. Gilbert,* 6 Gray, 94; *Fowles v. Bowen,* 30 N. Y. 25; *Kelly v. Partington,* 4 Barn. & Adol. 700, 24 E. C. L. 307.

The judgment must be reversed, and a new trial granted.

SHERWOOD, J., concurred with CHAMPLIN, J.

CAMPBELL, C. J. I am not satisfied the libel was privileged, and therefore concur in reversal.

MORSE, J. I concur in the reversal.