MADILL *v.* CURRIE.

1. LIBEL AND SLANDER—PRIVILEGE—TRIAL—CHARGE— EMBEZZLEMENT.

In libel for publication of language imputing to plaintiff the embezzlement of county funds, it was error to charge the jury that defendant, a county supervisor, was not privileged if the jury could find he imputed to plaintiff a crime, where the objectionable charge was contained in a report made to the public by a letter prepared by defendant as chairman of . an investigating committee duly appointed to investigate the accounts of the county treasurer.[1]

2. SAME—QUALIFIED PRIVILEGE.

It is the occasion that determines the question of privilege, not the language employed.

3. SAME.

And a report of such chairman upon a matter of public concern, under circumstances showing that the public were interested in knowing the true state of facts, was qualifiedly privileged.

[1] Privilege as to proceedings for impeachment or removal of public officers, see note in 25 L. R. A. (N. S.) 455.
Privilege of official report by executive or administrative officer, see note in 5 L. R. A. (N. S.) 163.

4. SAME—BURDEN OF PROOF—JUSTIFICATION—CRIMINAL CHARGE.
   Defendant was not required to show that plaintiff was in fact guilty, by testimony sufficient to prove it beyond a reasonable doubt; a mere preponderance would suffice.[1]

5. SAME—CONFLICTING INSTRUCTIONS TO JURY—CHARGE—TRIAL.
   When conflicting instructions are given, one of which is erroneous, it is presumed that the jury may have followed that which was erroneous.

6. SAME.
   That defendant published his report in a newspaper instead of filing it with the county clerk, does not destroy the qualified privilege.

7. SAME—IMPLIED MALICE—PRESUMPTION.
   Where words imputing misconduct to another are spoken by one having a duty to perform, and the words are spoken in good faith to those who have an interest in the communication, and a right to know and act upon the facts stated, no presumption of malice arises from the speaking of the words, and therefore no action can be maintained without proof of express malice.

Error to Bay; Collins, J. Submitted November 13, 1911. (Docket No. 93.) Decided March 12, 1912.

Case by Leslie D. Madill against Gilbert A. Currie for libel. Judgment for plaintiff. Defendant brings error. Reversed.

*Gilbert A. Currie* and *Julius B. Kirby* ( *L. P. Coumans*, of counsel), for appellant.

*James Van Kleeck* ( *Floyd L. Post*, of counsel), for appellee.

STONE, J. This is an action to recover damages for the publication of an alleged libel. Plaintiff is a resident of Midland county, and served as county treasurer for the four years immediately prior to January 1, 1909, and served as deputy county treasurer under his father, John Madill, for the four years immediately prior to January

---

[1] Pleading and proving truth as defense in libel suit, see note in 21 L. R. A. 511.

1, 1905. The defendant is also a resident of Midland county, and at the time of the commencement of the investigation hereinafter referred to was a member of the board of supervisors of that county. The board of supervisors of Midland county employed one Charles H. Winke, a certified public accountant, to audit the books and records of the office of the county treasurer for the period of 11 years immediately prior to January 1, 1909. In his report of this audit, the accountant advised that, on account of no definite records having been kept by the county treasurers relative to the rebate transactions, it would be necessary to have an audit made of these transactions in order to determine whether the amounts taken by the county treasurers for rebated county taxes were correct or not. At various times the board of supervisors had passed what are termed "rebate resolutions." These resolutions contained a provision that the purchaser of certain lands therein described (in some instances of State tax lands in designated township), upon which the taxes were delinquent for three years and upwards — that is, State tax lands—could pay the county tax thereon by giving 10 per cent. thereof, and instructed the treasurer to charge the remaining 90 per cent. to the contingent fund. The full amount of the county tax would appear to the credit of the contingent fund, but the treasurer, collecting only 10 per cent. thereof, would charge the contingent fund with 90 per cent. rebated, and thus balance the account. In a number of instances the township boards would adopt similar resolutions and make a like disposition of the township's portion of the taxes delinquent against such lands, and would instruct the township treasurer to receipt to the county treasurer for the amount of county tax thus rebated. These amounts would be charged against the account of a township, but, of course, would have no bearing on the amounts of credit taken for county tax rebated which would be charged to the contingent fund of the county.

The rebate credits taken during the two terms of John

Madill—January 1, 1901, to January 1, 1905—amounted to $2,473.27. Credits for alleged rebating of county tax were taken by the plaintiff during his first two terms— January 1, 1905, to January 1, 1909—as follows:

In 1905 _____ $3,088 02
In 1906 _____ 1,935 14
In 1907 _____ 2,225 34
In 1908 as follows:  June 30, $1,556 13
                     Dec. 31, 2,958 63_____ 4,514 76

No records were kept showing either to whom or upon what description such rebates were alleged to have been given. Seven hundred and seventy citizens and electors of Midland county petitioned the board at its January, 1909, session to have these rebate transactions audited, and the board employed said accountant, Winke, to make such audit, and appointed a committee, consisting of the defendant, as chairman, plaintiff, Byron Burch and Robert H. Lane as the other members, which committee was to assist in the investigation and have charge of the same. The board further provided:

"That said expert shall complete his work on said county treasurer's books within thirty days of the time he is employed and shall file his report with the county clerk within thirty days; and said committee shall also file its report with the county clerk within the same time."

The accountant filed with the clerk the report of his audit on February 23, 1910, which report showed a shortage of over $2,900 in the accounts of the treasurer's office for the last five years covered by the audit; that is, during the last year of John Madill's term and the two terms of plaintiff. Before making his report the accountant requested a meeting of the audit committee. The committee met on February 7, 1910, with a stenographer in attendance, and the accountant made known to the committee his findings. The plaintiff, under oath, endeavored to explain the alleged shortage. Some time afterwards, and prior to March 11, 1910, the defendant, who was chairman of the investigation committee, requested the com-

mittee to join with him in making a report, and notified them that, if they neglected or refused to join with him, he would feel at liberty to make a report.

On March 11, 1910, defendant caused to be published in the Midland Sun a statement or report in the words and figures following, as alleged in the declaration:

"To the Citizens of Midland County:

"Owing to the persistent and almost universal demand on the part of the people of Midland county to know the contents of the certified public accountant's report on the audit of the rebate credits taken by the treasurers for the eleven years prior to January 1, 1910, I have decided to give out this statement upon my own responsibility.

"The audit committee has been in possession of the facts concerning the findings of the accountant since February 7, and the accountant's report has been filed with the county clerk since February 22. Inasmuch, therefore, as the time within which we were expressly instructed to report by the board of supervisors has long since expired, I gave notice to the committee at a meeting Saturday evening last, that if a report was not to be made very soon to the public showing the progress made by us to date, I should feel at liberty to make any statement concerning the matter which seemed to me proper.

"The report of the audit of the three years of Treasurer Burrington's work shows that he took credit for rebated taxes to the amount of $1,285.03, while the audits of the records show him entitled to $1,289.30, a discrepancy of $4.27 in favor of the county. Mr. Burrington also filed, in nearly every instance, a statement showing the descriptions sold upon rebate basis and giving the exact amount that Treasurer Burrington charged, not only against the county, but the townships as well, for rebate, and made it a comparatively easy matter to check over his work and verify his credit entries.

"No statements giving memoranda of rebate transactions occurring during the terms of John Madill or Leslie Madill, are on file in the treasurer's office.

"The report of the audit of John Madill's term shows that no rebating was done by him prior to the several general rebate resolutions passed at the October, 1904, session of the board of supervisors, except in two or three instances under special resolutions to which he referred in

taking his credit and the amount of said special credits are correct. Following the adoption of the several rebate resolutions in October, 1904, purchases were made and reported by the auditor general in the months of November and December, upon which the rebates amounted to $1,034.64 and application was actually made to Leslie D. Madill, deputy treasurer, in December, 1904, and the money paid to him for the purchase of certain lands in Lincoln township upon which the rebate amounted to $1,272.34; the application for the purchase of these lands was not made, however, by the county treasurer to the auditor general until January 25, 1905, but the resolution under which this purchase was made became void January 1, 1905. It was admitted by Mr. Madill under oath that it was his practice to compute the amount of rebate for the purchaser at the time the application was made to him and he therefore knew in December, 1904, what the rebate amounted to on the lands, the application for which, he for some reason, withheld until January 25, 1905. The treasurer would have no right to give rebate on these purchases if made after January 1, 1905, and the logical and safe course for him to follow would be for him to take credit for the amount of this rebate on December 31, 1904, which the accountant says he did do according to the records. The credit taken by L. D. Madill for John Madill on December 31, 1904, was $2,368.00 and in drafting the report of the committee on settlement with the county treasurer, the written part of which is in Leslie D. Madill's handwriting and the balance typewritten, reference is made to this credit as 'Rebate of ninety per cent. of the county taxes as per resolutions of the board of supervisors, October, 1904.'

"The total rebate on lands reported as sold by the auditor general in November and December, 1904, and those reported in January and February, 1905, but for which an application was actually made to the county treasurer in December, 1904, under a resolution becoming void January 1, 1905, amounted to $2,306.98. Mr. Madill before the audit committee on February 7, claimed that he was entitled in his term, commencing January 1, 1905, for the rebate on the purchases just mentioned as having been applied for to the auditor general on January 25, 1905, under the resolution becoming void January 1, 1905, and claimed that the deficit which would then be made in his father's credit was made up by rebate to Will E. Reardon, W. D.

Gordon, Gardner & O'Dell and William Timmons, for purchases made by them in April and May, 1904, under a rebate resolution dated January 20, 1899, and under which no rebating had been done for years, and claimed credit for his father for drain at large which he claimed had always been by him rebated as a county tax, and claimed credit for rebating certain drain special to N. A. Bentley and Winslow Inman amounting to $65.15, also which he claimed he rebated as county tax. Upon computing the amount of rebate claimed as extra credit by L. D. Madill for John Madill to make up the deficit caused by taking out of the December 31, 1904, credit the rebate above mentioned of $1,272.34 in order to have credit for that amount himself, it is found that these extra credits will, if considered, fall hundreds of dollars short of making up this $1,272.00.

"At a meeting Tuesday night, Mr. Madill appeared with counsel, and, upon the advice of his counsel, refused to make any statement. Accountant Winke was sworn as a witness at the request of counsel for Mr. Madill, and from the questions asked by counsel and Mr. Lane, I believe Mr. Madill is going to alter his sworn testimony of February 7, and claim other rebating to have been done by him for his father prior to 1904, but the nature and extent of this claim I have been unable to learn.

"The following is a comparison year by year of the credits taken and the amount that should have been taken as shown by the accountant's report:

| Year | Amounts Entitled to | Credits Taken |
|------|--------------------|--------------| 
| 1904 | $2,413 76 | $2,473 27 |
| 1905 | 3,050 96 | 3,088 02 |
| 1906 | 1,891 22 | 1,935 14 |
| 1907 | 2,274 39 | 2,225 34 |
| 1908 | 1,666 46 | 1,556 13 |
| | $11,296 79 | $11,277 90 |

December 31, 1908, Extra credit taken by ex-Treasurer L. D. Madill and claimed by him before the audit committee to be a balance for which credit should have been taken in the several credits previously taken during the above five years.............................. 2,958 63

$14,236 53

" (This included the $1,272.34).

" Mr. Madill had taken credit on June 30, 1908, for $1,556.13 and testified that he had on that date taken credit for every cent he believed he was entitled to up to that time, and that each time he took credit upon his books, he took all the credit to which he believed he was entitled.

" There was comparatively few sales in 1908, after this June credit was taken and Mr. Madill attempts to justify his taking of the credit for $2,958.63 on December 31, 1908, by saying that at the close of his term in December, 1908, he checked over the rebate transactions and found that he had cheated himself out of approximately $2,900.00 in computing the rebate credits.

" The accountant in making this audit construed the rebate resolutions to include no drain taxes, ' for reasons: (1) No special taxes, drain or otherwise, are specified in the resolution.' (2) ' A comparison of the audit figures with the credits taken in the aggregate or otherwise, for all the years covered in both periods shows the credit entries made, up to but not including the last entry in the five year period, to be practically correct without drain taxes.'

" In this connection it may be stated here that not only do the resolutions fail to specify drain taxes, but the board of supervisors' construction of its resolutions practically defining the same to include the county taxes only, as set forth above, is upon the records.

" Drain taxes are clearly special taxes and the board of supervisors have no more to do with the raising of the drain tax than they have to do with the township taxes and they are reported by the auditor general under head of ' Other Taxes.' Yet Mr. Madill claimed before the committee that he was entitled to credit for all drain at large prior to 1903 tax—since then drain at large has been expressly considered as a township tax—and claimed to have rebated the following special drain:

| 1905 | Year's Tax | Tax | Interest |
|---|---|---|---|
| March—Wm. Young, | 1888, | | |
| nw ¼ nw ¼ 25, 16 n 1 e. | | $66 40 | $127 49 |
| July—M. Rider, | 1904, | | |
| s ½ ne ¼ 12, 14 n 1 w. | | 66 00 | 3 30 |
| June—F. G. Kneeland, | 1904, | | |
| s ½ sw ¼ 16, 14 n 1 e. | | 24 00 | 96 |
| April—F. E. Winchell, | 1904, | | |
| w ½ ne ¼ 8, 13 n 2 e. | | 16 00 | 51 |

| 1905 | Year's Tax | Tax | Interest |
|---|---|---|---|
| April—F. E. Winchell, | 1903, | | |
| sw ¼ of ne ¼ 8, 13 n 2 e. | | $18 00 | $2 52 |
| July—Ed. L. Brown, e ½ | | | |
| nw ¼ 25, 16 n 1 w. | | 50 75 | 20 81 |
| July—Ed. L. Brown, s ½ | | | |
| ne ¼ 25, 16 n 1 w | | 79 75 | 32 70 |
| | | $321 53 | $188 29 |
| 1906—None. | | | |
| 1907 | | | |
| May—Wm. E. Crane, | 1905, | | |
| n ½ of ne ¼ 30, 16 n 2 e. | | 54 50 | 9 10 |
| May—Wm. E. Crane, | 1899, | | |
| n ½ of ne ¼ 30, 16 n 2 e. | | 48 00 | 41 76 |
| May—F. G. Kneeland, | 1906, | | |
| nw ¼ 32, 14 n 2 w. | | 14 40 | 58 |
| | | $116 90 | $51 44 |
| 1908 | | | |
| May—D. N. Maxwell, | 1906, | | |
| sec. 19, 15 n 1 w. | | 42 21 | 6 18 |
| May—D. N. Maxwell, | 1895, | | |
| se ¼ sw ¼ 28, 15 n 1 w. | | 8 77 | 13 94 |
| May—D. N. Maxwell, | 1904, | | |
| sec. 19, 15 n 1 w. | | 41 21 | 16 07 |
| May—D. N. Maxwell, | 1904, | | |
| sec. 19, 15 n 1 w. | | 41 21 | 11 13 |
| | | $132 40 | $47 32 |

" Relative to the above claims for rebated drain taxes, I will say that he was not authorized by any resolution to make such rebates, and he recognized that fact by claiming to have only rebated the drain special on some occasions and not as the general rule. Not only did he have no authority to rebate the drain tax, but I have personal knowledge of the falsity of his claim in many instances and will produce the proof.

" If Mr. Madill were to be given credit for all claim that he has made to date to the audit committee he would still be short several hundreds of dollars in his accounts.

" In taking the credit of $2,958.63 on December 31, 1908, which the accountant says he had no authority to take, but which Mr. Madill attempts to justify largely by claiming that on reauditing his books he found about this amount of mistake, it is a significant fact that Mr. Madill

admitted under oath that in addition to taking this large credit he was even then obliged to borrow money to settle up with his successor, Mr. Erwin.

"In making this statement, I have been conservative and stand ready at any time to answer any criticism that may be made."

For this publication plaintiff has brought this action, charging defendant with libel. The case was transferred to the circuit court of Bay county, and upon the trial before a jury and under the charge of the court a verdict of $500 was awarded the plaintiff. The defendant moved for a new trial, and assigned error. The motion was overruled by the court and opinion filed. The defendant excepted to the findings of the court and assigned error.

The assignments of error which we shall have occasion to consider relate to the charge of the court, and certain refusals to charge. In his charge to the jury the court used the following language:

"Now, gentlemen of the jury, I have come to the conclusion that it is my duty to submit to you the question as to whether or not either of these charges amounted to a charge of embezzlement. And the reason for that I will give you. Now, if the word 'embezzlement' had been used, or 'criminal shortage' had been used, I could say upon a reading of the article that this was a charge of embezzlement as a matter of law, and could instruct you that embezzlement was charged; but the article does not contain those words, and I am unable to say that the article as a matter of law in these respects charges embezzlement, and upon that point I charge you now, and shall not repeat that charge, although what I shall say later will refer to it and may refer to it more than once. I charge you now this: That if the expression which I first read, 'If Mr. Madill were to be given credit for all claims that he has made to date to the final audit committee he would still be short several hundred dollars in his accounts,' in connection with the other part of the article would indicate fairly, and reasonably indicate and show to those who read that article, to the readers of it, to the public generally, that the article did charge Mr. Madill with being criminally short, or charged him with being an embezzler, if you find that to be so, why, then, the

charge of embezzlement—then the article means a charge of embezzlement. Similarly, referring to the statement which I have read: 'In taking credit for $2,958.63 on December 31, 1908, which the accountant says he had no authority to take, but which Mr. Madill attempts to justify largely by claiming that on reauditing his books he found this amount of credit, it is a significant fact that Mr. Madill admitted under oath that, in addition to taking this large credit, he was even then obliged to borrow money to settle up with his successor, Mr. Erwin'—I say taking that statement in connection with the other statements in the article, if it satisfies you, that as read by the people of Midland county at large they would reasonably and naturally draw the inference that embezzlement was thereby intended to be charged, you will treat the article as charging the offense of embezzlement."

Also the following:

("The defendant in this case was not privileged to charge the plaintiff in this case, Mr. Madill, with embezzlement. That is not one of the things that privilege protects against, and the result of that is this: That, if you find under the instruction I have given you that the defendant in that article charged Mr. Madill with a crime, then the burden of proof is upon the defendant, Currie, to prove the truth of the charge. The burden of proof is not upon the plaintiff to prove that it is not true, but the burden of proof is upon the defendant, Currie, if that charges a crime, to prove that the charge is true as a defense. On the other hand, as to the statements in the article other than the two which I have read to you in your hearing, I think that the defendant is entitled to the protection and benefit of a privilege as to what was said, and before they can be considered as libelous, before you can treat them as libelous, it must be established that all of the allegations complained of in the article other than the two which I have referred to—that is, to those articles, the plaintiff cannot treat them as libelous, and you will not consider as libelous, unless plaintiff proves that they are not true. To restate it, as to the statements in the articles imputing a crime to Mr. Madill, the burden of proof is upon the defendant, Currie, to prove these articles are true, as a protection to himself on that account. As to the statements in the article not imputing a crime to the defendant, Currie [plaintiff Madill], as to those articles be-

fore they can be considered as libelous, the testimony must satisfy you by its greater weight, or, in other words, the burden of proof is on the plaintiff to show that these statements are not true."

And in addressing counsel during his charge the court said:

("You do not contend that if these privileged communications—statements that were untrue—they were still privileged?")

Upon the question of privilege the court further instructed the jury as follows:

("And I instruct you, as I think I have, already, that this was a privileged communication in view of all the circumstances; that is, that it was a privileged communication excepting those parts of it which the jury find charged Mr. Madill with having committed a crime.")

In regard to the credits claimed by the plaintiff for alleged rebating of drain taxes, the court further instructed the jury:

"Before he can be charged in any criminal sense, or in any criminal way, the jury must be satisfied beyond a reasonable doubt that he knowingly as well as unlawfully took such credits."

And the court also charged the jury:

"I rule that for the purpose of this case those drain taxes were not lawful credits, but, as before stated, that nothing of a criminal nature could be imputed to Mr. Madill in taking these credits, without it appears by the preponderance of proof that they were knowingly and unlawfully taken as credits."

The court refused to give defendant's ninth and fourteenth requests to charge, which read, respectively, as follows:

"I further charge you and instruct you that in this case, from all the surrounding circumstances, considering the defendant's position as chairman of the committee in question appointed by the board of supervisors of the county, and considering the circumstances wherein he attempted to procure a report from the committee and

failed, that the article published by him on March 11th, and complained of by the plaintiff, is a privileged communication, and, if it was made in good faith by him, the plaintiff cannot recover in this case."

" I further instruct you in this connection that it does not make any difference as to whether the statements in the articles were true, or false, if they were made with an honest belief that the same were true, and were made without malice upon the part of the defendant, because the nature of his position was such that he had a right to make the statement, if he believed it to be true, to the public."

This brings us to the consideration of the second, third, and fourth assignments of error, which begin with that portion of the charge beginning with the words, " The defendant in this case was not privileged," etc., and including the matter embraced in the parentheses in the charge.

A perusal of this and other portions of the charge indicate clearly that the court repeatedly instructed the jury that the defendant could not be privileged in imputing to the plaintiff the commission of a crime. This we do not understand is the law in this State. See *Bacon* v. *Railroad Co.*, 66 Mich. 169–171 (33 N. W. 181); *Schultz* v. *Guldenstein*, 144 Mich. 636–641 (108 N. W. 96), and cases there cited, holding that the occasion determines the privilege.

It seems to have been the view of the learned circuit judge that the language used in the article, and not the occasion of its use, would determine the question of privilege. We think there was error in this portion of the charge. The court in denying the motion for a new trial seeks to excuse this portion of the charge by stating that there was neither an occasion of privilege nor a privileged communication involved in the case, and that, therefore, the error, if any, was harmless. We cannot agree with this position. We do not think it can be successfully claimed that this defendant, chairman of an investigating committee, whose appointment by the supervisors was instigated by the petition of seven hundred and seventy

electors of the county, in publishing this report to them of
a matter of such public concern, should be placed upon
the same footing as a libeler publishing some private
gossip, scandal, or personal abuse, and, as we shall here-
after more fully state, we think the defendant was entitled
at least to the benefit of the rule of qualified privilege.
For the learned circuit judge frequently during his charge
to direct the attention of the jury to certain portions of
defendant's statement or report, and tell them each time
in effect that no accusation or crime could be privileged,
not only constituted an erroneous statement of the law,
but, in its very nature, must necessarily have impressed
the jury that there was something in those statements to
which the court wanted them to give special attention,
and the natural result of their being told so emphatically
and often that such accusations could not be privileged
would probably, as it did in this case, result disastrously
to the defendant.

The sixth assignment of error relates to that portion of
the charge above quoted, as follows:

"Before he can be charged in any criminal sense, or
in any criminal way, the jury must be satisfied beyond a
reasonable doubt that he knowingly as well as unlawfully
took such credits."

This we do not understand to be an accurate statement
of the law. If the burden of proof was upon the defend-
ant in this case, and crime is charged, defendant is re-
quired to show plaintiff guilty by a preponderance of evi-
dence only, and not beyond a reasonable doubt. *Peoples*
v. *Evening News Ass'n*, 51 Mich. 11–17 (16 N. W. 185,
691); *Owen* v. *Dewey*, 107 Mich. 67–73 (65 N. W. 8).

The erroneous statement was in no place corrected by
the learned trial judge, although he did in another in-
stance charge as follows:

"I rule that for the purpose of this case those drain
taxes were not lawful credits, but, as before stated, that
nothing of a criminal nature could be imputed to Mr. Ma-
dill in taking these credits, without it appears by the pre-

ponderance of proof that they were knowingly and un-
lawfully taken as credits."

We do not think it can be logically contended that this
last statement would correct the former erroneous state-
ment. Upon this subject this court said:

"When conflicting charges are given, one of which is
erroneous, it is to be presumed that the jury may have
followed that which was erroneous, and the verdict will
be reversed." *Grand Rapids, etc., R. Co.* v. *Monroe,*
47 Mich. 152–154 (10 N. W. 179).

Even the use of the words "clear preponderance" under
some circumstances has been held reversible error. *Hoff-
man* v. *Loud,* 111 Mich. 156 (69 N. W. 231); *J. H. Wor-
den Lumber & Shingle Co.* v. *Railway Co., ante,*
74 (133 N. W. 949).

The tenth and eleventh assignments of error complain
of the refusal of the court to charge the jury as requested
in defendant's ninth and fourteenth requests to charge,
above set forth. A certified public accountant had
audited the plaintiff's books and found a shortage of
about $2,900. He also found, and this fact is admitted
by plaintiff, that no records or memoranda had been
kept by plaintiff to show upon what descriptions, or to
what persons rebate had been given. The accountant
had requested a committee meeting which was held on
February 7, 1910, at which the accountant made known
the finding of his audit. The plaintiff endeavored, under
oath, to explain the shortages shown, and his explanation
involved the names of a considerable number of people to
whom he claimed to have given rebates. The time for the
committee to make its report had long since expired. The
accountant had made and filed his report. The subject-
matter was one of public concern and interest. If a short-
age existed, the taxpayers of the county were interested in
it, and must either recover it from the plaintiff or raise
additional taxes upon themselves. Unless a special ses-
sion were called the board of supervisors would not meet
before the following October, but the annual election of

supervisors would occur within a month. It is undisputed that the defendant requested the other members to join with him and report their doings. This the other members neglected at least to do. If the committee had joined in making this report, without a question it would have been absolutely privileged under the decisions of this court. *Trebilcock* v. *Anderson*, 117 Mich. 39 (75 N. W. 129); *Wachsmuth* v. *National Bank*, 96 Mich. 426 (56 N. W. 9, 21 L. R. A. 278).

Under all the circumstances of this case, considering that the defendant was legally appointed and was serving as chairman of the committee to investigate plaintiff's accounts, and that an accountant hired to audit these accounts found a shortage, as above stated, by reason of a credit taken on the last day plaintiff was in office, the fact of the failure to keep books to show the truth of the matter in dispute certainly furnished some reason why the public should be apprised of the condition of plaintiff's accounts and the claims advanced by him. We cannot say that the defendant was not endeavoring to perform a duty he owed to the public to make known to them what the accountant had found in relation to the plaintiff's accounts, and the progress made to that date by the audit committee.

It is contended that defendant should have filed his report with the county clerk. Does that fact destroy the privilege? We think not. Although his appointment came from the board, defendant's duty was to represent, and perform a public service for, the citizens and electors of Midland county who were interested in the subject-matter. Upon this subject, see Newell on Slander and Libel, §§ 96, 98, at page 500, § 101 at page 504; *Howland* v. *Flood*, 160 Mass. 509 (36 N. E. 482). In *Bradley* v. *Heath*, 12 Pick. (Mass.) 163 (22 Am. Dec. 418), Chief Justice Shaw said:

"Where words imputing misconduct to another are spoken by one having a duty to perform, and the words

168 MICH.—36.

are spoken in good faith, and in the belief that it comes within the discharge of that duty, or where they are spoken in good faith, to those who have an interest in the communication, and a right to know and act upon the facts stated, no presumption of malice arises from the speaking of the words; and therefore no action can be maintained in such cases, without proof of express malice."

Qualified privilege extends to all communications made bona fide upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, to a person having a corresponding interest or duty. *Bacon* v. *Railroad Co.*, 66 Mich. 166 (33 N. W. 181); *Trimble* v. *Morrish*, 152 Mich. 624 (116 N. W. 451, 16 L. R. A. [N. S.] 1017); *Flynn* v. *Boglarsky*, 164 Mich. 513 (129 N. W. 674, 32 L. R. A. [N. S.] 740). The distinction between the last-cited case and the instant case is very clear. In the *Flynn Case* the subject-matter was not such as to concern the welfare of the public generally, but in the case at bar the subject-matter was of the utmost interest and concern to the electors of Midland county, to whom the communication was addressed, and we cannot say that the course pursued was not the only feasible and effective manner of reaching them. Years ago this court held that the publication of a report of matters of public interest is privileged, and not actionable unless express malice is proved. See the language of Judge Cooley in *Miner* v. *Tribune Co.*, 49 Mich. 358 (13 N. W. 773). The careful examination of this record satisfies us that the defendant was at least entitled to the benefit of a qualified privilege, and that the court erred in failing to so instruct the jury, and that such error was prejudicial goes without saying.

Other errors discussed are not likely to occur upon a new trial in view of what we have already said.

For the errors pointed out, the judgment of the circuit court is reversed, and a new trial granted.

Steere, McAlvay, Blair, and Ostrander, JJ., concurred.