EVEREST *v.* McKENNY.

LIBEL AND SLANDER—PRIVILEGED COMMUNICATIONS—GOOD· FAITH—
MALICE.

> Where the president of a State normal school, whose duty
> it was to look after the students attending the school and
> their environment, and approve the rooming houses in
> which they lived, upon complaint against the plaintiff,
> one of such students, by four out of six roomers at the
> house where she lived, investigated such complaint and
> reported his conclusions to the keepers of the house, the
> occasion was privileged and an action for slander did
> not lie against him for language used by him in such
> report in regard to plaintiff without malice and in good
> faith.

Error to Washtenaw; Kinne, J.    Submitted January 12, 1917.    (Docket No. 112.)    Decided April 9, 1917.

Case by Mildred Everest against Charles McKenny for slander.    Judgment for defendant on a directed verdict.    Plaintiff brings error.    Affirmed.

*Lee N. Brown* and *Andrew J. Sawyer* (*H. A. Balser,* of counsel), for appellant.

*Alex J. Groesbeck,* Attorney General, *Samuel D. Pepper,* Assistant Attorney General (*John P. Kirk* and *Martin Cavanaugh,* of counsel), for appellee.

MOORE, J.    The plaintiff was a student at the State Normal School.    The defendant is president of that institution of learning.    The plaintiff sued the defendant in an action of slander.    Omitting the formal por-

tions of the declaration, the part which is material here reads:

"The said defendant * * * did falsely, wickedly, and maliciously, in the presence and hearing of others, on or about the 4th day of December, A. D. 1912, in the city of Ypsilanti, county and State aforesaid, speak and publish the following defamatory words of and concerning the plaintiff, to wit: 'Don't you know you (meaning Elizabeth West and M. E. Parkinson) are going to lose all your roomers if Miss Everest (meaning the plaintiff) stays. Miss Everest (meaning the plaintiff) is crazy (thereby meaning and intending to charge that the plaintiff was immoral, unchaste, a woman of loose habits, a person not fit to keep as a roomer, or to associate with, and a person without mind, and therefore unable to conduct herself in a rational and respectable manner).' By reason of speaking, publishing, and uttering of the said false, scandalous, malicious and defamatory words, she, the said plaintiff, has been and is greatly injured."

The defendant pleaded the general issue, and gave notice, among other things:

"That as such president, under the rules pertaining to the government of such college, it became and was his duty to approve of all boarding and rooming houses and societies in said city of Ypsilanti at which students attending said Normal College roomed or boarded, the general purpose of which rule was and is to secure rooming and boarding houses for such students as would be conducive to their welfare and for the purpose of discipline; that the said Elizabeth West and M. E. Parkinson had theretofore kept a rooming and boarding house for the students of the said Normal College, which up to the time of the said conversation had been approved as such by this defendant; that the said plaintiff, Mildred Everest, and several other students of the Normal College, had been rooming and boarding there, and that this defendant had been informed that the said Mildred Everest had been acting strangely and had been using unusual and objectionable language in said house in the hearing of other students, and that the said other students, who roomed and boarded in said house, had become

alarmed and disturbed by such actions and words; that thereupon this defendant caused an investigation to be made respecting the conduct of the said plaintiff, Mildred Everest; * * * that, if the said words were spoken at all, they were spoken as part of a general conversation and between the said defendant and one Elizabeth West and M. E. Parkinson, to wit, at the city of Ypsilanti, said county and State, at or about the time alleged in said declaration, and that the words there spoken by this defendant of and concerning the said plaintiff were spoken in good faith and without unnecessary publication, and that no words were spoken by the said defendant on such occasion, or upon any other occasion which in any wise reflected upon or intended to reflect upon the morality or chastity of the said plaintiff, or that called into question the morality or chastity of the said plaintiff, or that in any wise imputed that the said plaintiff was then or had ever been unchaste or immoral. * * * Defendant further says that inasmuch as he was, upon the occasion in question, performing his duty as president of the said Normal College in good faith, as aforesaid, the words spoken by him to the said Elizabeth West and M. E. Parkinson of and concerning the said plaintiff, Mildred Everest, were and are privileged communications."

After the testimony was all in, the defendant moved for a directed verdict for several reasons, and among them that the words uttered were privileged. The trial judge directed a verdict for the last-named reason in favor of the defendant. The case is brought here by writ of error.

The record discloses that there are in attendance at the school of which defendant is the president from 1,300 to 1,500 students, a large proportion of whom are young women from 17 to 25 years of age. Nearly all of these students live in rooming houses that must be approved by the school authorities before the students are permitted to live in them. The plaintiff roomed in a house that was on the approved list, kept by Elizabeth West, with whom Mrs. Parkinson, a sis-

ter of Elizabeth West, lived. Besides the plaintiff, five other students roomed at this house. After a time differences arose between the plaintiff and the other students, which seemed to have their origin in the fact that Mrs. Chapman, a music student, practiced upon the piano when Miss Everest claimed it interfered with her studying. The trouble reached such an acute stage that one of the inmates of the house, Mr. Chapman, went to the defendant with a complaint as to the conduct of the plaintiff and what she said. He reported to the president that plaintiff had used language that he repeated to the president that is obscene and profane and would not look well in print, ending with the statement, "I will poison every one of them," referring to the other roomers. The defendant inquired in whose presence this language was used, and was told that three others of the roomers were present. He sent for each of them, and each of them confirmed the statements of Mr. Chapman. He then sent for Elizabeth West, the landlady of the plaintiff, and her sister, and it is at this interview that it is alleged the slanderous words were spoken. The testimony differs as to what occurred at this interview, but all are agreed that the president told these ladies what had been reported to him. They say he stated in the course of the interview that Miss Everest was crazy. He denies that he used the word "crazy," but says he stated that he thought she was abnormal. It ought to be said that the plaintiff denies she ever used the language attributed to her. Her landlady says she never saw anything in her conduct that was not proper.

The record discloses that on the evening of the day of the interview two of the girls rooming in the house of the plaintiff came to the dean of the woman's department crying, and asked permission to move. As a result the following letter was sent:

"Michigan State Normal College, Ypsilanti.
          "Office of the President.
"MRS. ELIZABETH WEST,
    "914 Congress St.,
      "Ypsilanti, Michigan.
*"My Dear Mrs. West:* I had expected, as I inti-
mated, at the close of our conference yesterday, that
the situation at your house would remain undecided
for a few days until I could hear from Miss Everest's
brother, but the events of last night make it necessary
for the students rooming at your house to move. They
are leaving with my permission. They are not in a
condition of mind to do their school work, and I have
no moral right to force them to live under conditions
which are so extremely unhappy as those now exist-
ing in your home. The best thing for all of us to do
is to accept the inevitable and let the students leave
quietly. Let me also say that what has occurred will
not prejudice us against your house in the future,
and that if proper conditions are brought about we
shall be willing that students room at your house.
              "Very truly yours,
                    [Signed] "CHAS. MCKENNY.
"A. M. December 5, 1912."

In the meantime a letter had been written to the
brother of the plaintiff, who lived at Frankfort. He
replied:

"Received your letter last night. Am at a loss to
know what to advise you to do. I have not been with
my sister much of late years, but I have noticed a
burden on her mind, which seemed to temporarily
overbalance her mind. From a child she has been
self-willed, and has always hesitated to listen to family
advice. I am sure it would be of no use for me to
write my sister, as it would anger her against me.
I am sorry that things are as they are, and I am at
a loss to know how to advise you. Please regard this
letter as strictly confidential."

Communication was also had with another brother,
who wrote the president as follows:

"You 'phoned me today in reference to my sister,
who is now attending the State Normal. You asked

that I call in consultation. I feel that I can hardly spend the time from my work. I cannot understand what can be the difficulty, and wish you would write me in detail. I would rather not have the matter spoken over the telephone. Please do not call my parents' attention to this matter. It would be of great sorrow to them. If there is anything the matter, I would rather you would let me know, and I will see what can be done."

Other investigations and inquiries were made, and the following letter was sent:

"Michigan State Normal College, Ypsilanti.
"Office of the President.
"MISS MILDRED EVEREST,
"Ypsilanti, Michigan.
"*My Dear Miss Everest:* After thorough investigation of the work which you have done in class during the present quarter and your general fitness for teaching, it seems quite fair to say that teaching is not the line of work you should fit yourself to do. I believe that every one should get into the line of work for which she is best suited, and I strongly feel that you could do better in some other line of work than you will do in teaching. For that reason I do not think it is best for you to return next quarter. As I said at the beginning of this letter, I have given this matter very careful consideration, and my decision in the matter is final. I shall be glad to be of any service to you that I may.
"Yours very sincerely,
[Signed] "CHAS. MCKENNY, President."

We have quoted this correspondence because of the claim, which will appear presently, of counsel for appellant. It is conceded that whether an occasion is privileged or not is a question for the court. *Bacon* v. *Railroad Co.*, 66 Mich. 166 (33 N. W. 181). But it is said whether the facts or circumstances which give the communication the privileged character claimed for it are established by the evidence is a question for the jury. It is also contended that the question of the good faith of the defendant and the presence or ab-

sence of actual malice are purely questions of fact, and must be left for the decision of the jury, and that there is evidence from which these might be found.

The questions involved in this case are not new in this State. In affirming a directed verdict in *Howard* v. *Dickie,* 120 Mich. 238 (79 N. W. 191), Justice MONT-GOMERY, speaking for the court, said:

"It is urged that the occasion was not privileged, for the reason that, if the defendant believed that the plaintiff was wanting in integrity, or that he failed to live up to his vows as a member of the church, it was defendant's duty to take steps to expel plaintiff from the church, rather than to attempt to prevent his election to an office in the church. We cannot assent to his view. The defendant was called on to vote for or against the plaintiff, and it was certainly his duty, or at least his privilege, to make known, in response to an inquiry from another member of the conference, any facts within his knowledge which bore upon the question of plaintiff's fitness for the place; and if this was done without malice, and in good faith, we have no doubt it was privileged. *O'Donaghue* v. *McGovern,* 23 Wend. [N. Y.] 26; *Dial* v. *Holter,* 6 Ohio St. 228; *Shurtleff* v. *Stevens,* 51 Vt. 501 (31 Am. Rep. 698); *Kirkpatrick* v. *Eagle Lodge,* 26 Kan. 384 (40 Am. Rep. 316); *Howard* v. *Thompson,* 1 Am. Lead, Cas. 167, note.

"The question whether there is any evidence justifying an inference of malice is more difficult of determination. The rule is well settled that, when it appears that the occasion is privileged, the plaintiff has the burden of proving actual malice. The rule is stated in a note to *Howard* v. *Thompson,* 1 Am. Lead. Cas. 167:

"'The showing of a privileged occasion *prima facie* removes the quality of malice, and puts upon the plaintiff a necessity of showing express or actual malice; and, if this be proved, the defense entirely fails. And this express proof of malice appears to consist in all cases in showing *mala fides* in the defendant—that is, that the occasion was made use of colorably, as a pretext for wantonly injuring the plaintiff; and this express malice, being matter of fact and motive, is upon sufficient

evidence a question for the jury. The fact that the words were consistent with malice is not enough; they must be inconsistent with *bona fides.*'

"We have held that malice may be inferred from circumstances under which the publication takes place in some cases, as that the slander was uttered in the presence of third persons, when no necessity existed for so public an accusation. *Garn* v. *Lockard*, 108 Mich. 196 [65 N. W. 764]. So, too, if it be shown that the alleged slanderous statement was known to be untrue, this is sufficient proof of malice. *Harrison* v. *Howe*, 109 Mich. 476 [67 N. W. 527]. But in this case there is no evidence of actual malice unless it be held that the evidence tending to show that the charges made were ill-founded is sufficient for that purpose. There was nothing in the manner of the defendant on the occasion in question to indicate ill will towards the plaintiff; on the contrary, the evidence negatives this. No previous utterances of defendant tend to show malice. * * * To remove privilege by evidence of the untruth of the words spoken would therefore leave one acting under a qualified privilege in practically no better attitude than one who can plead no such privilege. This question was before the court of queen's bench in *Fountain* v. *Boodle*, 3 Q. B. 5. It was said by Patteson, J.: 'Falsehood in fact is no proof of malice, unless the proof involves knowledge of the truth.' In *Somerville* v. *Hawkins*, 10 C. B. 583, it was said that the supposition that defendant believed the charge is always to be made when the question is whether a communication is privileged or not. In *Harris* v. *Thompson*, 13 C. B. 333, it was said by Williams, J., citing *Fountain* v. *Boodle:* 'The mere circumstance of the statement being false will not suffice to show malice, unless there is some evidence to show that the defendant knew it to be false.' "

In *Trimble* v. *Morrish*, 152 Mich. 624 (116 N. W. 451, 16 L. R. A. [N. S.] 1017), Justice CARPENTER, speaking for the court, said:

"In the law of slander there are two classes of privileged communications. There are communications which are absolutely privileged; and there are

communications which have a qualified privilege. A communication absolutely privileged—as, for instance, words spoken by a judge in his judicial capacity in a court of justice—is not actionable, even though spoken maliciously. Where the privilege is qualified, the communication is not actionable if made in good faith. It is actionable if made maliciously; that is, with actual malice. It is not claimed that the communication in question is absolutely privileged. It is claimed that it is qualifiedly so. Says Mr. Justice CHAMPLIN, speaking for this court in *Bacon* v. *Railroad Co.*, 66 Mich. 170 [33 N. W. 181]:

"'Qualified privilege * * * extends to all communications made *bona fide*, upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, to a person having a corresponding interest or duty. And the privilege embraces cases where the duty is not a legal one, but where it is of a moral or social character of imperfect obligation.'

"Within this rule defendant had a qualified privilege to make the communication in question. He had an interest in the business of Dr. Rogers. He had become possessed of information which affected that business. It was clearly his duty to communicate it to the doctor. It follows that, in making this communication, he committed no actionable wrong, unless he exceeded the limits of his privilege—unless he acted maliciously. Is there evidence that he acted maliciously? Plaintiff insists that there is. Her counsel say that malice is to be inferred from the falsity of the statement. The contrary is the rule.

"'The falsity of the charge alone will not establish malice, so as to authorize a recovery, if the charge be privileged, and only becomes sufficient when coupled with evidence tending to show that plaintiff made the charges knowing them to be false, or with other evidence tending to show malice.' 25 Cyc. p. 524.

"Said this court in *Edwards* v. *Chandler*, 14 Mich. 471 [90 Am. Dec. 249]:

"'Where a communication is privileged, the plaintiff cannot recover without proving affirmatively, not only the falsehood of its contents, but also that it was published with express malice.'

195 Mich.—42.

"See, also, *Konkle* v. *Haven*, 140 Mich. 472 [103 N. W. 850].

"It is said that malice may be inferred because defendant declined to name his informant. No authorities are cited in support of this contention, and it does not appear to us to be sound. Defendant was told that, if he would name his informant, he would not be troubled. He declined to do this, saying:

" 'The story was told to me in confidence, and I do not desire to implicate any other person in it.'

"This is the precise course that a high-minded person would have taken. He would have taken that course, not because he was actuated by a desire to save a wanton wrongdoer, but from considerations of true manliness. Only a despicable character would have availed himself of the privilege of escaping responsibility by exposing another to the danger which threatened him. Surely, because one does just what he ought to do, it should not be said that his conduct furnishes evidence of malice.

"Plaintiff also insists that malice may be inferred from the words of the privileged communication. He relies upon the following statement in the opinion of *Bacon* v. *Railroad Co.*, *supra:*

" 'The jury may find the existence of actual malice from the language of the communication itself as well as from extrinsic evidence'—citing cases.

"This does not mean, as the argument of plaintiff's counsel seems to assume, that the inference of malice can always be drawn from the language of a privileged communication. No such proposition was before the court. What was meant was this: That when a privileged communication contains on its face evidence of malice, that evidence may be used to prove malice. This is made clear by the application of the principle in that case, and by the authorities cited in its support. Respecting this point, the law is correctly stated in the following quotation from the opinion of the supreme court of Pennsylvania in *Mulderig* v. *Wilkes-Barre Times*, 215 Pa. 474 [64 Atl. 636, 114 Am. St. Rep. 967]:

" 'If there is that in the publication which furnishes a basis for reasonable inference that malice was back of it, the burden

remains with the party charged to establish, either its truth, or the probable ground for believing it true. When such is not the case, there must be some evidence beyond the mere fact of publication; but there is no requirement as to what the form of evidence shall be. It may be intrinsic, from the style and tone of the article.'

"It is not contended that the communication in question contained on its face any evidence of malice. It clearly did not. We conclude, therefore, that defendant had a right to a directed verdict, upon the ground that the communication was privileged."

See, also, *Wieman* v. *Mabee*, 45 Mich. 484 (8 N. W. 71, 40 Am. Rep. 477) ; *Madill* v. *Currie*, 168 Mich. 546 (134 N. W. 1004).

In the instant case we have a defendant who is at the head of a great institution of learning, who is expected, and whose duty it is, so far as he is able, to look after the students attending the school, and to look after their environment. He has relations, too, with the keepers of the rooming houses in which these students find temporary homes. If the defendant, after receiving the communications mentioned from four out of the six roomers stopping at the house of Elizabeth West and Mrs. Parkinson, had not conferred with those ladies, he would have been derelict in his duty. The occasion was privileged. A careful reading of the voluminous record does not disclose any evidence from which a legitimate inference of actual malice can be drawn, nor does it disclose a lack of good faith.

The judgment is affirmed, with costs to defendant.

KUHN, C. J., and STONE, OSTRANDER, BIRD, STEERE, and BROOKE, JJ., concurred. FELLOWS, J., did not sit.