MUNDY *v.* HOARD.

1. LIBEL AND SLANDER—VOLUNTARY WITNESS—PRIVILEGE — ABSO-
LUTE PRIVILEGE.

Where defendant was a voluntary witness at a public
hearing of the police committee of the common council
of the city of Bay City, called for the purpose of in-
vestigating certain charges made by members of the de-
partment against members principally of the police de-
partment, at which the mayor, who was not under in-
vestigation, presided, statements made by defendant at
that time to the effect that he had been told that a
man in the business of illegally transporting booze from
Detroit to the city claimed to be protected by the officials,
and that defendant carried away the impression from the
conversation that liquor had been placed in the mayor's
cellar by this man, *held*, not absolutely privileged so as
to relieve him from liability, in an action thereon for
libel by the mayor.

2. SAME—TRIAL—INSTRUCTIONS—QUALIFIED PRIVILEGE— MALICE —
QUESTION FOR JURY.

The trial court properly charged the jury that the state-
ment was only qualifiedly privileged, and that the ques-
tion of malice, under the circumstances, was one to be
determined by them.

3. SAME—QUALIFIED PRIVILEGE—MALICE—GOOD FAITH — EVIDENCE
—BURDEN OF PROOF.

While, in case of qualified privilege, the burden of prov-
ing actual malice, or lack of good faith, is on the plaintiff,
the evidence to prove same may be either intrinsic, being
shown by the nature of the language used, and the
manner and extent of its publication, or extrinsic, con-
sisting of facts which show previous ill-feeling, or personal
hostility, or that the statement was made without the
defendant's having made reasonable inquiry and investi-
gation and not in good faith.

4. SAME—HEARSAY—GOOD FAITH—QUESTION FOR JURY.
Whether reasonable inquiry and investigation had been

made by the defendant before giving utterance to his impressions, when he repeated a slander based on mere hearsay, were questions for the jury to determine.

5. SAME—PROOF NECESSARY.
It is not necessary to a recovery, in an action for libel, for the plaintiff to prove that the defendant knew the slanderous words to be false.

6. SAME—GOOD FAITH—MALICE—QUESTION FOR JURY.
The good faith of the defendant, and whether he made proper inquiry and investigation, or whether he spoke recklessly and with express malice, are questions for the jury to answer, under proper instructions.

7. SAME—TRIAL—INSTRUCTIONS—REQUESTS TO CHARGE.
The charge of the court, as a whole, *held*, to fairly submit the case to the jury; there being no error in the charge as given or in refusing to give defendant's requests to charge.

Error to Bay; Snow (Ernest A.), J., presiding. Submitted October 6, 1921. (Docket No. 41.) Decided December 21, 1921.

Case by Robert V. Mundy against Guy V. Hoard for slander. Judgment for plaintiff. Defendant brings error. Affirmed.

*Stoddard & McMillan* and *Curtis E. Pierce*, for appellant.

*Collins & Thompson*, for appellee.

STONE, J. This case was brought here on writ of error, sued out by the defendant, to review a judgment for the plaintiff in an action for slander brought by the plaintiff, then mayor of Bay City, against the defendant, the pastor of the First Methodist Church of that city. The alleged slanderous words were uttered by defendant at a public hearing of the police committee of the common council of the city, called for the purpose of investigating certain charges made by

members of the department against members princi-
pally of the police department growing out of certain
charges made by Patrolman Fox, a police officer of
the city, in a trial in the circuit court of Bay county
in a certain criminal case.   At the time of this so-
called investigation the city was governed by a charter
known as Act No. 514, Local Acts 1903.   Section 89
of chapter 8 of said act is as follows:

"The mayor shall annually appoint at the second
meeting of the council in April, or as soon thereafter
as may be convenient, four of the aldermen of
said city, who, together with the mayor, shall consti-
tute the police committee."

Section 91 is as follows:

"Said committee shall meet on the second Tuesday
of each month, and at any other time that the mayor
shall direct."

Section 93 in part is as follows:

"No member of the police force of said city shall
be removed without cause, and after a fair trial and
hearing by said committee upon specific allegations,
under such rules and regulations as the council shall
prescribe."   *   *   *

On November 29, 1920, the common council of the
city adopted the following resolution:

"By Alderman Tomlinson.   Resolved, That the
mayor be and is hereby authorized to subpœna any
witnesses, either for the police committee, or Patrol-
man Fox, who may be valuable in bringing out any
needed evidence in the public hearing to be held at the
city hall, Tuesday evening, November 30th."

No other resolution or action of the council author-
izing an investigation was passed or taken.   It ap-
pears that while the plaintiff issued several subpœnas
for witnesses to attend the investigation, no subpœna
was issued for, or served upon the defendant.   He

was a voluntary witness. The sessions of the committee which conducted the investigation were held at the city hall on two evenings, November 30th and December 7, 1920, the plaintiff, as mayor and chairman of the committee, presiding. The city attorney was present and conducted the investigation at the request of the committee; and at the request of the city attorney the proceedings were taken stenographically and the record was used in evidence on the trial of the instant case. At both sessions of the committee the plaintiff and committee occupied seats at a table in the center of the ground floor of the council chamber. The prosecuting attorney was present in his official capacity, as were also two other attorneys. We infer that the latter were acting in the interest of Patrolman Fox. The witnesses were asked to come forward by the city attorney, who conducted the examination on behalf of the mayor and committee. Most of the witnesses were cross-examined by the other attorneys. The witnesses when they testified sat at the table, occupying a seat next to the plaintiff. Estimates of the number of people in attendance vary from 500 to 1,000. The plaintiff opened the first session with a statement in which, after stating that the meeting was called for the purpose of investigating certain charges made against members of the police department, he said:

"We have called a public meeting so that everybody can hear what is said. We want everybody that is brought in on the witness stand to have a square deal. Nothing will be covered up. It will be open and above board. We care not where the chips fall. The man that is brought in guilty will have to suffer the consequences. I have this afternoon taken the pains to look up the record of Mr. Fox, and I find he has been in the police department for 14 years, and during that time he has been an efficient officer and one who has done his duty with never a mark against

216—Mich.—31.

him.    As mayor, and with members of the police committee we feel that the evidence given by Mr. Fox in the case of the People *v.* Bernice Stevens in the circuit court, is not only a reflection upon the heads of the police department, but also the police committee. Under the circumstances we have requested the city attorney to conduct this investigation."

It appears that at this session, Mr. Fox, the police officer, and some 6 other witnesses were sworn and examined, then the hearing was adjourned to December 7th.    On that occasion the mayor and committee met again at the same place, the same procedure being followed as before.    This second session was likewise opened by a statement by the plaintiff, in which, after asking the persons present to refrain from smoking, he said:

"I would like to impress upon your minds that this is not a council meeting; meetings of the council at which you may be present you are entitled to and have the right to as much demonstration as you see fit, but I want you to remember that this is a sort of court, and we are entitled to just as much consideration here as we would be entitled to in the circuit court or justice court.    The public have been invited to attend this meeting, and I ask you to keep order so that we can take the examination of the witnesses quietly."

Numerous witnesses, including 6 policemen, were called and examined.    There was testimony upon the trial that 3 ministers were called and examined by the city attorney, and there was evidence showing that "their testimony covered conversations with the chief of police and with the mayor, and related to the liquor situation in the city, and they referred to the conditions of vice and general welfare of the city in their testimony."    The city attorney then said:

"I might say to the committee that this is as far as I know of any names handed to me or that I have any knowledge of, that could be called, or would be called. If there is anybody present, officer, man or woman

who desires to testify, if they will come forward they will receive the courtesy they are entitled to. It is up to the officers themselves. I cannot say as to what they wish to do, and if there isn't anyone, the only thing that I know to do at this time is that the committee have the whole record. It will have to be typewritten out and they can meet and consider it and file their report for further action of the council, or in any way they may wish."

The defendant then came forward and was sworn, and testified that he had lived in the city over three years and was interested in the welfare of the city and betterment of government and conditions of the city; that he was acquainted with the chief of the department, and that he knew slightly other patrolmen or officers of the department; and that he had talked with the chief of police. He was then asked by the city attorney if he would tell now what he had in mind. He stated that he had two things particularly in mind that he wanted to speak of. First, he testified to a meeting of the preachers with the mayor and chief of police in the mayor's office more than a year prior. After giving in detail that interview the defendant then said:

"There is another matter that I feel I ought to speak of, though it seems to be violating the confidence of a personal conversation, but it seems to me the interest of the city in this matter is so great that I ought to say this. Is it necessary for me to state the person who gave me this information?

"*City Attorney.* I don't think so; you may. I will ask you, does it have reference to the misconduct of any official?

"*A.* It has reference to this, that wrongdoing in the city is protected.

"*Q.* You may tell it."

Then follows the remainder of the statement set up in the declaration, which is as follows:

"*A.* About the first week in November, 1920—I

very much dislike to state this on account of the fact that the conversation took place in a man's home where I was calling and not knowing I was going to do so I have had no chance to confer with him about it or tell him that I was to violate this confidence—in fact, he did not bind me to any confidence at all, but the matter was brought up; I was in the house of Dr. C. A. Traphagen, of this city, I made a call on him in the evening, and Mrs. Traphagen and the doctor and myself were talking, and Mrs. Traphagen spoke of the terrible vice conditions of the city, and the violations of the prohibition law, and she said, 'Mr. Hoard, why don't people do something, why don't somebody do something,' and then went on to tell me this case, and it was corroborated by the doctor. During the time she was talking to me, the doctor was called out by telephone message, and as we went on talking further about it, he corroborated it to this effect, that he had a very short time previous been called to the home of a man who was ill, or partially ill, and while there in attendance upon the man, they talked freely about the business the husband was in, and the wife made this statement to the doctor, that her husband was engaged in the business of transporting booze from Detroit to Bay City, and the doctor wondered at their being so free to make the statement to a person who was a comparative stranger—I think he made the statement that he had never before called upon the man, though I won't be so sure of that—and they seemed to feel very confident about it, but they said, 'We are in no danger, there won't anything happen to us,' and he asked him why. 'Why,' he said, 'the ones who would enforce the law in this city are so connected with this in a way that it will not be to their interest to let it be known,' and I cannot remember the exact words in which this was said, but my memory is—I carried away the impression from it that liquor had been placed by this man in the mayor's own cellar.

"*Q.* Now, is there anything further that you want to tell that you were told then or any other place in connection with a matter of this kind? .

"*A.* No, that was all. When Mrs. Traphagen asked again why didn't somebody do something, I told her

the reason, asking her if she would pardon me for speaking plainly about it, and I said, it is because people who know about these things keep them quiet because of being personally interested and connected with the business, and privately or otherwise, and do not bring the things to light that they know, therefore crime is protected."

On the trial in the instant case the plaintiff produced as a witness the stenographer who took the statements at the police investigation, and introduced the transcript of his notes containing the defendant's testimony at the investigation. The plaintiff was sworn in his own behalf. Among other things the plaintiff was asked by his counsel how defendant's testimony before the police committee made him feel. He answered, over objection of defendant's counsel, that he "went home and the next morning did not go to his place of business until around 10 o'clock." He also testified that he felt as if he didn't want to meet anybody, or "you might say sort of heartbroken." An employee in plaintiff's hardware store was called by plaintiff and he was asked if plaintiff had ever talked to him about defendant's testimony, and he answered, over objection of defendant's counsel, that he had. The plaintiff then rested his case, and defendant moved for a directed verdict on the ground that the statements complained of in the declaration were privileged, either absolute or qualified. The court denied the motion, holding that there was nothing in the case showing absolute privilege, and that it would consider the question of qualified privilege in instructing the jury. Thereupon the court allowed the plaintiff to reopen his case, and offer testimony to show the falsity of defendant's statements, and any additional evidence in regard to malice. Plaintiff was then recalled and made specific denials of the statements constituting the alleged slander. In this connection he was asked whether any person had paid him money,

or promised him anything, or done anything to get him not to enforce the law. Defendant's counsel objected to this on the ground that there was no charge in the declaration upon which any such question could be predicated. Plaintiff's denial was nevertheless received.

On cross-examination of plaintiff he was asked several questions as to having kept liquor in his basement, which were objected to by his counsel and the objections sustained. Plaintiff was then asked on cross-examination as to a conversation he had had with three different persons as to his possession of liquor after the State went dry, his intention to keep it and to use it, and means of getting more. These questions being objected to, were excluded by the court. There were other questions of a similar nature and the same ruling. In the same connection he was asked whether or not he said, at the hotel at Rose City, that he had a barrel of liquor in his cellar and would like to see any officer take it away from him. The court then remarked:

"Well, that wouldn't be anything unlawful if he said it. He would have a right to have it there, and a right to keep it if he did not acquire it unlawfully."

Defendant offered no testimony whatever. He was called as an adverse witness by plaintiff's counsel, and was cross-examined. At the close of the plaintiff's testimony the defendant renewed his motion for a directed verdict, and gave as additional reason for his motion that plaintiff must show not only the falsity of the charge complained of, but that defendant knew it to be false. The court overruled the motion and submitted the case to the jury, which returned a verdict for plaintiff of $200 damages, $150 thereof being for injury to his feelings.

There are 31 assignments of error and counsel for appellant say that they raise the following questions:

(1) Was defendant's alleged statement absolutely privileged?

(2) If qualifiedly privileged only, did plaintiff show any malice on the part of the defendant by a scintilla of evidence?

(3) Should not the court have charged the plaintiff could not recover unless he showed that defendant knew the alleged statement to be false?

(4) Did the court not err in restricting defendant's counsel, on cross-examination, from asking plaintiff as to statements made by him as to acquiring and possessing liquor?

(5) Other errors of the court in the admission of evidence and comment thereon.

The court, in part, charged the jury as follows, and error is assigned upon that portion of the charge contained in parentheses.

"13. The law of slander, gentlemen of the jury, recognizes two kinds of privileged communications. Perhaps I should say two classes of privileged communications. There are communications which are absolutely privileged, and there are communications which have a qualified privilege. A communication absolutely privileged, as for instance words spoken by a judge in his judicial capacity in a court of justice, is not actionable even though spoken maliciously. Where the privilege is qualified a communication is not actionable if made in good faith; it is actionable if made maliciously, that is, with actual malice. So that, gentlemen of the jury, the first thing for the court to determine in this case is whether or not there exists an actual or qualified privilege in this case. (Whether or not the, circumstances and surroundings under which the communication was made creates an actual or qualified privilege, and the court determines as a matter of law that the conditions as they existed at the time this statement is alleged to have been made does not create such a condition as would amount to an absolute privilege on the part of the defendant.) * * *

"15. Now, a qualified privilege extends to all communications made *bona fide* upon any subject-matter

in which the party communicating has an interest or
in reference to which he has a duty to a person having
a corresponding interest or duty, and the privilege
embraces cases where the duty is not a legal one, but
where it is of a moral or social character of imperfect
obligation (and you are instructed, gentlemen of the
jury, that under this definition of a qualified privilege
that as a matter of law there existed from the cir-
cumstances surrounding the making of this particular
communication by the defendant a qualified privilege).
*    *    *

"21. In cases of this kind malice is understood as
having a double significance; one, its ordinary mean-
ing of ill will against a person, and the other its
legal significance which is a wrongful act done in-
tentionally without just cause or excuse.    These dis-
tinctions have been denominated malice in fact and
malice in law.    (The first implies a desire and in-
tention to injure, the latter is not necessarily incon-
sistent with an honest purpose, but if false defama-
tory statements are made concerning another without
sufficient cause or excuse they are legally malicious,
and in all ordinary cases malice is implied from the
defamatory nature of the statements and their
falsity.)    *    *    *

"23. (The effect therefore of showing that the com-
munication was made upon a privileged occasion is
*prima facie* to rebut the quality or element of malice,
and casts on the plaintiff the necessity of showing
malice in fact, that is, that the defendant was actuated
by ill will in what he did and said, with a design to
maliciously or wantonly injure the plaintiff, and this
malice in fact, resting as it must upon the libelous
matter itself, and the surrounding circumstances tend-
ing to prove fact and motive, is a question to be de-
termined by the jury.)

"24. Now, the next question in sequence that I think
the jury should be instructed upon is how this malice
is to be determined.    Malice may be determined,
gentlemen of the jury, from all the surrounding facts
and circumstances connected with the case.    Our
courts have held that it may be determined ex-
trinsically from facts in addition to what appears in
the statement, or intrinsically from the statement it-

self, and the conditions and circumstances surrounding the making of the statement. (The jury may find the existence of actual malice from the language of the communication itself, as well as from extrinsic or outside evidence.)

"25. (If there is that in the statement or communication which furnishes a basis for a reasonable inference that malice was back of it, the burden remains with the party charged to establish either its truth, or the probable ground for believing it true, when such is not the case there must be some evidence beyond the mere fact of the publication, but there is no requirement as to what the form of the evidence shall be, it may be intrinsic from the style and tone of the article.

"26. When a privileged communication contains on its face evidence of malice, that evidence may be used to prove malice, in other words, gentlemen of the jury, you may take the statement itself, if it comes, in your mind, within the definitions I have just given you, to determine whether or not there was malice at the time the statement was made by the defendant in the case, for, as I have stated to you, that without malice, notwithstanding the statement was untrue, there can be no recovery in this case.)   *   *   *

"29. (Whether he gave it as of his own knowledge, or whether he gave it as of hearsay makes no difference; the statement to be taken into consideration in connection with the charge of malice that I have given you, so that the main question for you to determine in this case is whether or not there was malice under the definition and instructions I have given you.

"30. If there was no malice under those definitions and instructions the plaintiff cannot recover; if there was malice the plaintiff is entitled to recover, and in determining the weight of the testimony in this case you are instructed that the burden of proof is on the plaintiff to establish these facts to you, namely, that that statement was made, its falsity, and the malice in connection with the making of it.)   *   *   *

"36. (I charge you that slanderous words having been uttered and published, the law presumes that they have damaged the plaintiff, and the plaintiff is entitled to recover damage on account of injured feelings and

the damage to his reputation, without having made any specific proof of such damage.)     *    *    *

"38. The fourth request I give you as follows:

"39. (In reporting your verdict you will report such an amount for injured feelings as in your judgment the plaintiff has sustained to his feelings, and you will report such a separate amount for the injury to his reputation as in your judgment his reputation has sustained already, or will sustain in the future on account of the uttering and publishing of these slanderous words.)

"45. (I charge you that it is for you to determine, this occasion having been one of qualified privilege, whether or not the defendant exceeded the privilege, and if you believe from all of the testimony and from the statement itself, and the circumstances surrounding the giving of it, that the defendant was not actuated by good faith and was malicious, then the plaintiff having proven that the charges are false, and it being undisputed that they are false, the plaintiff would be entitled to recover in accordance with the instructions which I give you.")

The foregoing contains only a small portion of the charge of the court, which was a very full and careful presentation to the jury of the questions involved in the case.

We will consider the questions presented by counsel for appellant in their order:

1. Was defendant's statement absolutely privileged? The doctrine of privilege, both absolute and qualified, has been so often referred to, defined, and discussed by this court that it seems to us it is not necessary to dwell upon it.  Reference to the comparatively early case of *Bacon* v. *Railroad Co.*, 66 Mich. 166, and to the late cases of *Bolton* v. *Walker*, 197 Mich. 699 (Ann. Cas. 1918E, 1007), and *Westerhouse* v. *DeWitt*, 215 Mich. 296, and to the authorities there cited, and to the intervening cases, demonstrates, we think, that the trial court was not in error in holding that defendant's statement was not absolutely privileged.

This class of privilege is comparatively a narrow one, and is, speaking generally, strictly confined to legislative proceedings, judicial proceedings in the established courts of justice, acts of State, and acts done in the exercise of military and naval authority. In judicial proceedings the protection of the rule extends to judges, counsel and witnesses. We know of no authority for holding that the proceedings before the committee in the instant case were either judicial or *quasi*-judicial, within the meaning of the rule above stated. *Blakeslee* v. *Carroll*, 64 Conn. 233 (29 Atl. 473, 25 L. R. A. 106).

2 and 3. The second and third questions may be considered together. We think the trial court did not err in applying the rule of qualified privilege, in its charge to the jury. Newell on Slander & Libel (3d Ed.), at § 493, after speaking of absolute privilege, says:

"Qualified privilege exists in a much larger number of cases. It extends to all communications made *bona fide* upon any subject-matter in which the party communicating has an interest, or in reference to which he has a' duty to a person having a corresponding interest or duty; and the privilege embraces cases where the duty is not a legal one, but where it is of a moral or social character of imperfect obligation. The occasion on which the communication was made rebuts the inference of malice *prima facie* arising from a statement prejudicial to the character of the plaintiff, and puts upon him the burden of proving that there was malice. In short that the defendant was actuated by motives of personal spite or ill-will, independent of the occasion on which the communication was made.

"SEC. 496. A communication made in good faith upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, either legal, moral or social, if made to a person having a corresponding interest or duty, is qualifiedly privileged, and the burden of proving the

existence of malice is cast upon the person claiming to have been defamed.

"SEC. 497. . A communication, to be so privileged, must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or proper cause.

"SEC. 500. When the court holds the communication to be entitled to the privilege, the jury should be instructed to consider and determine whether or not the defendant used the occasion for the sole reason and purpose which conferred the privilege upon his statement; and if the jury find from the surrounding circumstances, as shown by the evidence, that he did so use it solely for such reason and purpose, the verdict will be for the defendant. But if, on the other hand, they find that he employed the occasion in bad faith, to gratify or to further some indirect or malicious motive, or for some other improper reason, the verdict will be for the plaintiff. Where the communication is entitled to the privilege the burden of proof is then upon the plaintiff to show actual malice, in the sense of oblique design or bad faith."

In 17 R. C. L. p. 329, it is said:

"Moreover, even if the court decides that a libelous communication or a slanderous statement was made on a privileged occasion, there still remains to be determined in the case of those communications only qualifiedly privileged the question whether such communication or statement was made in good faith, under an honest belief as to its truth and without actual malice; and if the court decides that a libelous communication was privileged, the question whether there was actual malice is for the jury to determine, either from direct proof, or as an inference from other proof, or from the libel itself. In other words, the use which the defendant has made of his privilege, that is, whether he has acted maliciously or not, is a question for the jury to decide."

While in case of a qualified privilege the burden of proving actual malice, or lack of good faith, is on the plaintiff, we have held that:

"The evidence to prove same may be either in-

trinsic, being shown by the nature of the language used and the manner and extent of its publication, or extrinsic, consisting of facts which show previous ill-feeling, or personal hostility," or that the statement was made "without the defendant's having made reasonable inquiry and investigation and not in good faith." *Zanley* v. *Hyde*, 208 Mich. 96, 102.

It is the claim of the plaintiff that express malice was shown in the case both intrinsically and extrinsically, and that the statement itself shows evidence of express malice. It is urged that the defendant was a voluntary witness, and in no sense spoke upon the question involved before the committee, but proceeded to slander the mayor, who was chairman of the committee; and that in no sense could the mayor have been under investigation. The statement of defendant was significant in that he repeatedly expressed his own impressions, viz.:

"I carried away the impression from it that liquor had been placed by this man in the mayor's own cellar."

Again:

"I said it is because people who know about these things keep them quiet, because of being personally interested and connected with the business, and privately or otherwise, and do not bring the things to light that they know, therefore crime is protected."

In a part of his statement not counted on, the defendant said:

"I recall that the mayor made the statement that the chief of police carried out his orders, and that he was responsible for what the police department did, himself. The effect of that upon my own mind, and I think upon the mind of the other ministers was this: That if there was any protection of evil doing in the city, it was known to the mayor, and came from the mayor."

Whether reasonable inquiry and investigation had

been made by the defendant before giving utterance to his impressions, when he repeated a slander based on mere hearsay, were questions for the jury to determine.    It is, urged by appellant that there was no evidence to show that the defendant *knew* the statement to be false, and claiming that such evidence was essential to support a recovery cites *Everest* v. *McKenny*, 195 Mich. 649, 656 (L. R. A. 1917D, 779), and kindred cases.    We do not understand that we have ever held that it is necessary to a recovery in such a case for the plaintiff to prove that the defendant *knew* the slanderous words to be false.    We have said that if "the defendant, at the time he spoke the words, knew what he said was false, and the statement was one calculated to result in injury of another * * * the jury should certainly find malice." *Harrison* v. *Howe*, 109 Mich. 476, 480.

The good faith of the defendant, and whether he made proper inquiry and investigation, or whether he spoke recklessly and with express malice, are questions for the jury to answer under proper instructions.    Taking the charge of the court as a whole, we are of the opinion that the case was fairly submitted to the jury; that the errors assigned upon the charge are without merit; and that the court did not err in refusing to give defendant's requests to charge, upon which error is assigned.

We have examined the assignments of error, and the record relating to the rulings upon the introduction of the evidence, and the remark of the court, complained of, and find no reversible error therein. Upon the whole record we are of the opinion that the defendant has no just cause to complain of the judgment, and the same is affirmed.

STEERE, C. J., and MOORE, WIEST, FELLOWS, CLARK, BIRD, and SHARPE, JJ., concurred.