# Order

**Michigan Supreme Court**
**Lansing, Michigan**

April 7, 2010

139223

JUDITH D. DADD,
       Plaintiff-Appellant,

v

MOUNT HOPE CHURCH AND
INTERNATIONAL OUTREACH
MINISTRIES and DAVID R. WILLIAMS,
       Defendants-Appellees.

Marilyn Kelly,
Chief Justice

Michael F. Cavanagh
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway,
Justices

SC: 139223
COA: 278861
Eaton CC: 05-000878-NO

_____/

On January 13, 2010, the Court heard oral argument on the application for leave to appeal the April 9, 2009 judgment of the Court of Appeals. On order of the Court, the application is again considered and, pursuant to MCR 7.302(H)(1), in lieu of granting leave to appeal, we REVERSE the judgment of the Court of Appeals and REINSTATE the jury verdict for plaintiff.

The trial court properly instructed the jury on false light invasion of privacy, which included an instruction that "plaintiff must prove by a preponderance of the evidence that the defendant must have known or acted in reckless disregard of the falsity of the information and the false light in which the plaintiff would be perceived." The jury found that the defendant acted with malice in making the statements which were the same ones alleged to have been defamatory. Because this finding of malice negates the qualified privilege that may exist in the context of the plaintiff's claims for libel and slander,[1] any error by the trial court in failing to instruct the jury on a qualified privilege for plaintiff's libel and slander claims is harmless. The defendants' remaining claims of error left unaddressed by the Court of Appeals are meritless.

MARKMAN, J. (*concurring in part and dissenting in part*).

---

[1] *Van Vliet v Vander Naald*, 290 Mich 365, 371 (1939) ("Where it appears that the occasion is subject to a qualified privilege, the burden is upon the plaintiff to prove the untruth of the statements and actual malice.").

I concur in the reversal of the judgment of the Court of Appeals with respect to plaintiff's false light claim. However, I dissent from the remainder of the order and would otherwise affirm the Court of Appeals and remand for a new trial. Plaintiff here sued her former church and pastor for negligence over an injury she sustained while engaged in one of the church's religious practices. After the pastor twice communicated his strongly negative views about plaintiff and her lawsuit — at a church leadership rally and in a letter written to a church prayer group — plaintiff again sued the church and pastor, this time bringing claims for defamation. A jury returned a verdict for plaintiff on claims of negligence, slander, libel, and false light. The Court of Appeals unanimously reversed on all but the negligence claim, which claim is not before this Court. The principal issue here is whether the trial court reversibly erred in failing to instruct the jury that defendant-pastor was entitled to a 'qualified privilege' as to his communications with his church. Because I agree with the Court of Appeals that the trial court did err, and thereby failed to give proper consideration to the speech interests of defendant, I respectfully dissent.

## I. FACTS & HISTORY

Defendant Mount Hope Church is an Assembly of God church in the Lansing area. Defendant David Williams is the church's pastor. In accordance with one of the church's core religious practices, it is customary at services and other gatherings for the pastor to call congregants to the altar to be prayed over. Sometimes, those who are prayed over fall to the ground, a phenomenon referred to as being "slain in the spirit." While there are ushers present at the altar to catch people, church members believe that a person who is "slain" in the Holy Spirit will not be hurt while engaged in this practice.

On July 18, 2002, plaintiff, who was at the time an active member of the church, was "slain in the spirit" and fell backward, injuring her head on the floor. A few months after the fall, when her medical bills began to accumulate, she inquired at the church whether it would pay for bills relating to the fall. Plaintiff was told that the church's insurance would pay only $5,000. Plaintiff then quit the church and filed a complaint seeking damages for negligence and gross negligence against the church and minister.

After the complaint was filed, defendant Williams spoke about plaintiff's lawsuit from the pulpit for about four minutes at a "leadership rally," attended by church "leaders, workers, and members." At this event, defendant aggressively questioned the merits of the lawsuit, as well as plaintiff's moral and spiritual character for bringing the legal action against her church, specifically stating that he thought that plaintiff had apparently "renounced her faith for mammon."

About three months later, defendant sent a letter to members of the "120-prayer group," a fifty-member church organization to whom he sent regular correspondence asking for their prayers on matters of concern to the church. One of the primary

requirements of this group was confidentiality. In this letter, defendant again forcefully denounced the lawsuit and plaintiff's moral and spiritual character, referring to her throughout as "the Accuser and Plaintiff," and asserting that he believed that she would be prosecuted for insurance fraud.

Based on defendant's statements, plaintiff filed an amended complaint including new claims for slander, libel, and false light. The trial court subsequently denied plaintiff's motion for partial summary disposition because it found that defendants "arguably" possessed a 'qualified privilege' regarding the challenged communications. Following plaintiff's presentation of her evidence at trial, defendant moved for a directed verdict, reasserting in regard to the defamation claims that a 'qualified privilege' exists. The court denied this motion. Finally, at the close of proofs, the court concluded that no privilege applied and refused defendants' requested instruction. Accordingly, instead of directing the application of a malice standard to 'privileged' communications, the court directed the application of a negligence standard to 'unprivileged' communications, stating as follows:

> The plaintiff has the burden of proving that the defendant was negligent in making the statement. When I use the word negligent I mean the failure to do something which a reasonably careful person would do.

This instruction was twice reread to the jury at its request on the second day of deliberations. The jury was also provided with an 11-page verdict form, which asked the jurors to answer 53 questions that had been approved by both parties under defendants' assumption that the trial court would give an instruction on 'qualified privilege.'

The jury returned a verdict for plaintiff on her claims of negligence, slander, libel, and false light. In the verdict form, with respect to the defamation claims, the jury affirmatively answered the question, "Did the defendant have knowledge that the statement was false or did defendant act with reckless disregard as to whether the statement was false?" The judgment reflected a verdict awarding plaintiff $40,000 for her negligence claim, $23,750 for her claim of false light, $50,000 for her claim of slander, and $200,000 for her claim of libel. With costs and fees, plaintiff's judgment totaled $317,255.68.

Defendants appealed as of right, and the Court of Appeals unanimously reversed the jury's verdict on plaintiff's defamation claims after finding that the trial court erred in failing to find that the statements were subject to a 'qualified privilege' and in instructing the jury accordingly. *Dadd v Mount Hope Church,* unpublished opinion of the Court of Appeals, issued April 9, 2009 (Docket No. 278861). The panel further determined that this error was not harmless:

This Court presumes that the jurors followed the instructions. Here, the jury was instructed to apply a negligence standard in determining liability for defamation claims. Thus, regardless of an additional question on the jury verdict form, this Court must presume that the jury followed the trial court's instructions. Further, the jury should have been instructed that "defendant had a 'qualified privilege' to communicate information." [*Id.* at 23, citations omitted.]

This Court directed that oral argument be heard on plaintiff's application for leave to appeal, and argument was heard on January 13, 2010.

## II. STANDARD OF REVIEW

Defendants sought a 'qualified privilege' jury instruction and objected to the trial court's decision denying this. The issue is thus preserved for appeal. MCR 2.516(C). We review claims of instructional error *de novo*, examining the instructions as a whole to determine whether there is error requiring reversal. *Case v Consumers Power Co,* 463 Mich 1, 6 (2000). We will only reverse for such error where failure to do so would be inconsistent with substantial justice. MCR 2.613(A).

## III. ANALYSIS

## A. DEFAMATION

To establish a defamation claim in Michigan, a plaintiff must show: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by publication. *Rouch v Enquirer & News II*, 440 Mich 238, 251 (1992). After the United States Supreme Court in *Gertz v Welch*, 418 US 323, 347 (1974), invited states to "define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual," this Court adopted negligence as the default standard of liability in Michigan. *Rouch v Enquirer & News I*, 427 Mich 157, 195 (1986).

## B. 'QUALIFIED PRIVILEGE'

However, a plaintiff's burden in a defamation claim may be considerably altered once the defendant raises a defense of privilege. Conceptually, this defense should be familiar to any student of tort law, as it relates to "[t]he ultimate problem . . . common to all areas of the law of torts" — "the balancing of one man's interests against another's acts." *Lawrence v Fox,* 357 Mich 134, 136-137 (1959). "The great underlying principle upon which the doctrine of privileged communication stands, is public policy." *Bacon v*

*Michigan Central R Co*, 66 Mich 166, 169 (1887). "The term privilege, then, having such origins, relates to a situation or occasion in which the importance of the criticism uttered by the defendant . . . justifies a modification, or, indeed, a withdrawal, of the protection normally afforded our citizens." *Lawrence,* 357 Mich at 137-138.

In defamation law, there are two classes of privileged communications. "There are communications which are absolutely privileged; and there are communications which have a 'qualified privilege.'" *Trimble v Morrish*, 152 Mich 624, 627 (1908). While an absolute privilege applies only in those situations in which the public interest is at its highest, a class "restricted to narrow and well-defined limits," as *Bacon* stated over a century ago:

> 'Qualified privilege' exists in a much larger number of cases. It extends to all communications made *bona fide* upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, to a person having a corresponding interest or duty. And the privilege embraces cases where the duty is not a legal one, but where it is of a moral or social character of imperfect obligation. [*Bacon,* 66 Mich at 170.]

In deciding whether a qualified privilege exists, courts of this state have consistently applied the rule that "the *occasion* determines the question of privilege . . . ." *Bennett v Stockwell*, 197 Mich 50, 54 (1917) (emphasis added); see also, *Weeren v Evening News Ass'n*, 379 Mich 475, 509 (1967); *Parks v Johnson*, 84 Mich App 162, 172 (1978). Indeed, this Court has repeatedly emphasized, "The question of privilege is to be determined by the occasion and not the language used." *Westerhouse v De Witt*, 215 Mich 295, 299 (1921); see also, *Lawrence*, 357 Mich at 139; *Fortney v Stephan*, 237 Mich 603, 609 (1927).

Church-related occasions have regularly been found to be subject to a 'qualified privilege.' See *Van Vliet v Vander Naald*, 290 Mich 365 (1939) (holding that publishing a church tribunal's findings in the church's official newspaper was a privileged occasion); *Westerhouse,* 215 Mich at 299 (holding that a "special meeting" called to reconcile two church members was a privileged occasion); *Konkle v Haven,* 140 Mich 472 (1905) (holding that church members writing a letter about a former pastor to members of another church was a privileged occasion); and *Howard v Dickie*, 120 Mich 238 (1899) (holding that a conference electing church trustees was a privileged occasion). These occasions were all subject to a 'qualified privilege' because the circumstances were such that the speaker had an interest or duty to communicate otherwise defamatory statements to those having a corresponding interest or duty, whether of a legal, moral or social character.

The defendant has the burden of proving the existence of a 'qualified privilege.' *Lawrence,* 357 Mich at 141. If he carries this burden, he "rebuts the prima facie inference of malice arising from the publication of matter prejudicial to the character of the plaintiff, and throws upon [the plaintiff] the onus of proving malice in fact." *Bacon,* 66 Mich at 172. The defendant is then entitled to a "presumption . . . that [he] acted in good faith and with proper motive." *Raymond v Croll*, 233 Mich 268, 274 (1925). Thus, the defense of 'qualified privilege' is of considerable value to a defendant because it: (1) rebuts the inference of malice from the defamatory statements, (2) clothes the defendant in a presumption of good faith, and (3) increases the plaintiff's burden by requiring the plaintiff to show that the defendant acted with malice, instead of merely negligence.

However, as its nomenclature suggests, the 'qualified privilege,' while of considerable force, is not absolute; rather, it is subject to a condition, "the condition being its exercise without abuse." *Lawrence,* 357 Mich at 141. Abuse of the privilege is found where the defendant has acted with "actual malice, in the sense of oblique design or bad faith." *Mundy v Hoard*, 216 Mich 478, 492 (1921) (citation omitted). Abuse may also arise "if the extent of the publication be excessive." *Smith v Smith,* 73 Mich 445, 446 (1889). In either case, the privilege is destroyed.

The question of whether the statements were made at a privileged occasion is for the court; the question of whether the privilege was abused is "for the jury, under proper instructions, and with respect to it the plaintiff carries the burden of proof." *Lawrence,* 357 Mich at 144.

In summary, the following principles guide a qualified privilege analysis in Michigan. First, the defense of qualified privilege should be applied where circumstances indicate that the importance of free and uncensored communication outweighs an individual's right in tort. Second, the defense is determined by the particular occasion of the communication and attaches where circumstances indicate that statements were made in good faith between persons who have a shared duty or interest in the subject matter. Third, the significant protections provided to a defendant by the defense are lost if plaintiff proves to the jury that the defendant abused the privilege.

## C. APPLICATION OF 'QUALIFIED PRIVILEGE'

When these legal principles are applied to the instant case, I agree with the Court of Appeals that the trial court erred as a matter of law in refusing to instruct the jury that defendant's statements were entitled to a 'qualified privilege.' To begin with, applying a qualified privilege in these circumstances is altogether consistent with the doctrine's underlying purpose of protecting communications that have social value and in which there are significant speech interests. Indeed, the "occasions" here at which defendant spoke are prototypical occasions to which the qualified privilege was intended to apply. The instant circumstances — a pastor communicating with his flock about a lawsuit that

questioned the integrity of a religious practice, threatened to harm the church financially, and damaged the pastor's professional reputation — implicate *multiple* important social values, any one of which might well support the application of the privilege.

First, there is social value and a significant speech interest in communications made by a pastor to his congregation. Specifically, there is value in a pastor's passionate communications about his faith both from the pulpit and in a letter to those under his spiritual direction who similarly care deeply about their faith. The importance of this type of religious expression "justifies a modification . . . of the protection normally afforded" an individual. *Lawrence,* 357 Mich at 138. This is not because the individual's interests are not significant, but because the stakes for society are so consequential. That is, the public has an interest in ensuring that its religious leaders can express their spiritual convictions within the context of the church organization freely and vigorously without "[f]ear of large verdicts in damage suits for innocent or merely negligent misstatement, [or] even fear of the expense involved in their defense . . . ." *Time, Inc v Hill*, 385 US 374, 389 (1967). The United States Supreme Court has often referred to this danger of self-censorship as a "chilling effect." *Nike, Inc v Kasky*, 539 US 654, 683 (2003) (Breyer, J, dissenting). Religious leaders are entitled to feel passionately about the values and practices of their churches, and they are entitled to communicate these sentiments to those within their churches who are also passionately committed about these values and practices. Defendant testified to the spiritual implications of plaintiff's lawsuit, explaining that plaintiff "was accusing the Holy Spirit of slaying her, bringing her injury, and she was accusing the members of our church of not showing her care and concern. That, that would be an issue to the church." While there is no *absolute* privilege for anything that might be said in this environment, there is a *qualified* privilege for statements made on such an occasion, and defendant was entitled to have this privilege clearly communicated and explained to the jury.

Second, there is social value and a significant speech interest in communications made in the context of litigation. Defendant was not just a pastor speaking about matters of significance to his church and his faith, but he, along with his church, had been named as a *defendant* in a lawsuit. Civil defendants, like the pastor here, are entitled to respond passionately to litigation directed toward them and toward institutions to which they are deeply attached. They are entitled to be offended by such litigation and to be offended by persons who bring such litigation, and they are also entitled to communicate these sentiments within appropriate channels and on appropriate "occasions." They are not limited in their responses to finely-crafted, lawyer-like statements. Concomitantly, a civil plaintiff, by undertaking a lawsuit against another, must expect that a defendant's response will be harsh and critical. They must expect that a defendant will take such lawsuit personally. The legal backdrop of this case is an important factor in the balancing of interests that shapes the 'qualified privilege' because everything defendant said was directly and exclusively related to plaintiff's lawsuit, and it was in communicating about this lawsuit in his own idiom that defendant was subjected to even greater liability. The

public has an interest in ensuring that parties to litigation can express views about the merits of a lawsuit in good faith and on a proper occasion without fear of exposure to *additional* liability. Moreover, the particular lawsuit in this case carried substantial financial implications for defendant's church, and presumably for defendant's continued association with that church. Defendant was in a position analogous to a CEO of a company subject to a lawsuit, who not only has a legal duty to report liabilities to his shareholders, including exposure to damage awards, but also, to the extent he believes appropriate, to explain and justify his management. See *Hollowell v Career Decisions, Inc*, 100 Mich App 561, 575-576 (1980) (defendant-corporate officer "was entitled to a 'qualified privilege' in the statement made at the board meeting regarding the performance of [the company]"). Once again, while there is no *absolute* privilege for anything that might be said in this environment, there is a *qualified* privilege for statements made on such an occasion, and defendant was entitled to have this privilege clearly communicated and explained to the jury.

Third, there is social value and significant speech interests in communications meant to defend one's professional reputation. This is particularly true for a member of a profession, such as is defendant, which is dependent on a person's moral standing and integrity within the community. Plaintiff's lawsuit directly called into question defendant's professional prerequisites to be the pastor of his church. Thus, it seems entirely appropriate for defendant to try to defend his reputation by forcefully presenting his side of the story to those in the church who are essentially his employers. Yet again, while there is no *absolute* privilege for anything that might be said in this environment, there is a *qualified* privilege for statements made on such an occasion, and defendant was entitled to have this privilege clearly communicated and explained to the jury.

I emphasize that the two "occasions" on which the statements in controversy were made here are exactly those contemplated as justifying the 'qualified privilege' in the first place. On the first of these "occasions," defendant spoke from the pulpit at a "leadership rally" that was a regularly scheduled event attended by the lay leadership of his church. On the second "occasion," he wrote a letter to a church prayer group for the purpose of eliciting prayers for the church. These "occasions" consisted of regular and ordinary occurrences in the life of the church. Defendant did not invent these forums for the purpose of making defamatory statements about plaintiff, and there is nothing surrounding these circumstances to suggest that his statements were not sincerely-felt and made in good faith. Moreover, at these "occasions," the interests of the speaker and of the audience were perfectly aligned. That is, defendant did not make his statements to passers-by on the street, or to the Lansing State Journal, or a television program watched by people having no direct interest in the lawsuit. Rather, he communicated only with people who shared a deep commitment to the church's religious practices, its financial well-being, and its standing in the community. When we apply the governing rule that the privilege is determined "by the occasion and not the language used," *Westerhouse*,

215 Mich at 299, it is incomprehensible how these two events could not be deemed occasions subject to a 'qualified privilege.'

The trial court did not reach this same conclusion because it did not engage in a proper analysis of whether the "occasions" at issue were privileged by considering the totality of the circumstances, the whole "stage" as it were. *Lawrence*, 357 Mich at 139. Instead, it was distracted by inquiries concerning the audience, specifically treating as dispositive whether the audience included *only* church members, and whether these members were all truly "decision makers." While the nature of the audience constitutes an important consideration in determining the existence of a 'qualified privilege,' none of the cases in which this privilege has been recognized in a church-related setting has engaged in these kind of inquiries. See e.g., *Van Vliet*, 290 Mich at 367 (statements subject to 'qualified privilege' even though they were disseminated beyond local church members and beyond church "decision makers"). I respectfully believe the trial court erred as a matter of law in concluding that the privilege did not apply and in failing to instruct the jury on this defense.

## D.  INSTRUCTIONAL ERROR

The majority concludes that any failure by the trial court to instruct the jury on a 'qualified privilege,' even if error, is "harmless" in light of the fact that the jury was instructed to apply an "actual malice" standard to plaintiff's false light claim and found defendant liable for the same statements that were alleged to be defamatory. I respectfully disagree.

First, the Court of Appeals correctly noted that, as to the defamation claims, the jury was instructed to apply a negligence standard, one that establishes a significantly lower threshold than the malice standard that applies to the 'qualified privilege.' As the Court of Appeals stated, "there is a clear difference between proving 'something which a reasonably careful person would do' and proving 'defendant had knowledge that the statement was false, or that the defendant acted with reckless disregard as to whether the statement was false.'" *Dadd,* slip op at 22-23. The Court of Appeals also observed that the jury twice asked for reinstruction on this issue and thus heard the negligence instruction three times. *Id.* Presuming that jurors follow their instructions, *Dep't of Transportation v Haggerty Corridor Partners*, 473 Mich 124, 178-179 (2005), the Court of Appeals concluded that the jury determined defendants' liability by applying a negligence standard, not the malice standard they should have applied. *Dadd,* slip op at 24.

Second, because defendants were entitled to a 'qualified privilege,' "the presumption [was] that the defendant [had] acted in good faith and with a proper motive." *Raymond,* 233 Mich at 274. As *Raymond* explained, this presumption affords significant protection to a defendant.

To overcome the presumption of good faith the circumstances must be such as to show that the defendant was actuated by a bad motive, which led him to take advantage of the occasion to injure the plaintiff. The court should not permit dishonesty of purpose to be lightly inferred from acts which are just as consistent with good faith as with bad faith. If the circumstances relied on as showing malice are as consistent with its nonexistence as with its existence, the plaintiff has not overcome the presumption of good faith, and there is nothing for the jury. [*Id.* at 275-276.]

Thus, this presumption in favor of defendant throws on plaintiff a heavy burden *to even reach the jury*. While the false light instruction at least correctly mentioned that plaintiff bore the burden on the malice standard in the context of that claim — something that the verdict form did not do on the defamation claim — this instruction does not cure the primary error brought about by the trial court's conclusion that the 'qualified privilege' was inapplicable. That is, in ruling on defendants' motion for directed verdict, the trial court should have viewed the evidence with a strong presumption of good faith in favor of defendants in determining whether plaintiff had met her burden to maintain the defamation claims. The trial court should have been mindful that "a plaintiff does not sustain the burden of proof which is cast upon him by merely giving evidence which is equally consistent with either view of the matter in issue [i.e., malice]." *Id.*

In this analysis, the following questions would have been relevant: Was defendant's reason for taking to the pulpit at the leadership rally and writing his regular, confidential letter to a leadership prayer group to defame plaintiff? Or, were there other equally plausible purposes for his statements at these occasions — for instance, his interest in his reputation and that of his church, his duty to inform members about matters of financial concern to the church, or his duty to reinforce the spiritual commitments of those under his guidance to church practices that had been called into question by the lawsuit? If the trial court had found that defendant's acts were "just as consistent with good faith as with bad faith," then plaintiff would not have carried her burden. However, because of its threshold error in determining that the 'qualified privilege' did not apply, the trial court never engaged in *any* such analysis. Defendants simply did not receive the very substantial benefit of the doubt afforded to them by the presumption of good faith attached to the 'qualified privilege.'

Third, even assuming, that plaintiff *did* meet her burden and that the defamation claims *were* properly before the jury, the false light instruction on the definition of "actual malice" did not cure the trial court's error as to the defamation instructions. The United States Supreme Court has defined "actual malice" as acting "with knowledge that [a defamatory statement] was false or with reckless disregard of whether it was false or not." *New York Times v Sullivan,* 376 US 254, 280 (1964). The malice standard

applicable in cases of 'qualified privilege' under Michigan law has been variously defined as: "actual malice, in the sense of oblique design or bad faith;" *Mundy*, 216 Mich at 492 (citation omitted); or a "showing [of] *mala fides* in the defendant — that is, that the occasion was made use of colorably, as a pretext for wantonly injuring the plaintiff." *Howard,* 120 Mich at 239 (citation omitted). Under the proper malice instruction, the jury should have been instructed as to these standards, and directed to consider "whether the defendant used the occasion for the sole reason and purpose which conferred the privilege upon his statement [in the first place]." *Mundy,* 216 Mich at 492.

The jury here was not so instructed. Indeed, it never even heard the term "malice," as it was not used in either the instruction on false light or in the verdict form on defamation. This error was not rendered harmless where the jury was instructed on a general definition of "malice" in the context of a different claim, and where it never heard the term, much less what it meant, in the particular context of 'qualified privilege.' Moreover, the refused instruction did not present the only opportunity to apprise the jury of the purpose and effect of the 'qualified privilege,' which was arguably dispositive here. "[I]t remains for the court to instruct the jury as to the nature and legal effect of the 'qualified privilege' and its bearing upon their consideration of the facts in issue." *Bolton v Walker*, 197 Mich 699, 706 (1917). Because the trial court's error in this regard, the jury was supplied with no guidance as to the relevance of the contextual background for defendant's communications, defense counsel was prevented from offering closing arguments in which he could have sought to explain this relevance, and plaintiff's counsel was able thereby to avoid responding to defendant's arguments, thus signaling to the jury that such context was of considerable significance in resolving this case. Simply put,the jury never heard why the "occasions" at issue were privileged, what "malice" requires where the 'qualified privilege' obtains, and where the burden of proof lies in such cases.

Finally, these considerations only begin to suggest what was lost to defendants because of the trial court's error in not instructing on the 'qualified privilege.' In the jury's eyes, defendant was effectively placed "upon the same footing as a libeler publishing some private gossip, scandal, or personal abuse," *Madill v Curie,*168 Mich 546, 559 (1912), even though the circumstances surrounding his statements present something very different. Because this case falls so squarely within the 'qualified privilege,' implicating social values and speech interests that are at the core of the privilege, the costs of denying defendant its protections are so substantial. Defendant truly required the protections of the 'qualified privilege,' because the difference in the way the jury would perceive his conduct with and without the privilege was so very different. By refusing to instruct on this privilege, the trial court effectively communicated to the jury that defendant's interests in defending, passionately, the tenets and practices of his faith and of his church, in responding to a lawsuit that called his own integrity and that of his church into question, in defending his management and leadership of a church whose financial stability had been threatened, all to a limited

audience that almost exactly shared these concerns, did not matter, that none of this mattered in assessing defendant's liability for defamation. However, all of this does matter, and it matters greatly, under the law of this state. Defendant was entitled as a matter of law to be viewed by the jury as someone other than the equivalent of a person uttering "private gossip, scandal, or personal abuse." He was entitled to bring context to bear in defending himself, and he was not allowed to do this.

## IV. CONCLUSION

The trial court erred as a matter of law when it determined that the two church-related occasions on which defendant made statements concerning plaintiff and her lawsuit were not subject to a 'qualified privilege.' Furthermore, where the trial court never informed the jury that defendant possessed a 'qualified privilege' to communicate the information in controversy; where the purpose and legal effect of the 'qualified privilege' was never explained to the jury and allowed to supply context for defendant's communications; where defendant was deprived of the presumption of good faith that attaches to the 'qualified privilege'; where the operative standard of "malice" and its meaning in this specific context was never shared with the jury; where the jury was never instructed on the correct burden of proof to apply in cases involving the 'qualified privilege'; and where the jury was repeatedly instructed to apply an incorrect, and lesser, standard for discerning liability, I am unable to conclude that the trial court's error was "harmless." If a properly-instructed jury had returned this same verdict, such a verdict could not be disturbed. However, to allow this verdict to stand on plaintiff's defamation claims in light of this error is, in my judgment, "inconsistent with substantial justice." MCR 2.613(A).

For these reasons, I would affirm that part of the Court of Appeals' decision that reversed the jury's verdict on plaintiff's claims of slander and libel, and remand for a new trial on these claims.

CORRIGAN, J., joins the statement of MARKMAN, J.



I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

April 7, 2010

Clerk

0331